**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on behalf of Athilon Capital Corp., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 6990-VCL |
| VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVISORS LLC, and EBF & ASSOCIATES, LP, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION**

Date Submitted: April 13, 2015
Date Decided: May 4, 2015

Lisa A. Schmidt, Catherine G. Dearlove, Russell C. Silberglied, Susan M. Hannigan, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harold S. Horwich, Sabin Willett, Samuel R. Rowley, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Attorneys for Plaintiff Quadrant Structured Products Company, Ltd.*

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, David Elsberg, Sean P. Baldwin, Nicholas F. Joseph, Rollo C. Baker IV, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York, New York; *Attorneys for Defendants Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., and Athilon Structured Investment Advisors LLC.*

Garrett B. Moritz, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendant Merced Capital, L.P., formerly known as EBF & Associates, LP.*

**LASTER, Vice Chancellor.**

Plaintiff Quadrant Structured Products Company, Ltd. ("Quadrant") owns debt securities issued by defendant Athilon Capital Corp. ("Athilon" or the "Company"), a Delaware corporation. Quadrant contends that Athilon is insolvent and has asserted derivative claims for breach of fiduciary duty against the individual defendants, who are members of Athilon's board of directors (the "Board"). Earlier decisions in this action have dismissed some of Quadrant's claims. Quadrant's remaining counts assert that (i) the Board breached its fiduciary duties by transferring value preferentially to Athilon's controller, defendant EBF & Associates ("EBF"), and to Athilon Structured Investment Advisors, LLC ("ASIA"), an EBF affiliate, and (ii) the transactions constituted fraudulent transfers under the Delaware Uniform Fraudulent Transfer Act ("DUFTA").

The defendants have moved for summary judgment. They contend that for a creditor to have standing to maintain a derivative action, the corporation on whose behalf the creditor sues must be insolvent at the time of suit and continuously thereafter. According to them, there can be no dispute of material fact about Athilon's current solvency. They also contend that Athilon was solvent at the time of suit.

When defining solvency for purposes of their arguments, the defendants say that a plaintiff bears a greater burden to establish insolvency than the traditional balance sheet test, under which "an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992). They say a plaintiff additionally must plead and later prove what historically has been required for a creditor to obtain the appointment of a receiver under Section 291 of

the Delaware General Corporation Law (the "DGCL"), 8 *Del. C* § 291, namely that the corporation has no reasonable prospect of returning to solvency.

This decision rejects the defendants' attempt to impose a continuous insolvency requirement for creditor derivative claims. To bring a derivative action, a creditor-plaintiff must plead and later prove that the corporation was insolvent at the time the suit was filed. This decision also rejects the defendants' attempt to establish irretrievable insolvency as the metric for determining when a creditor has standing to sue derivatively. To bring a derivative action, the creditor-plaintiff must plead and later prove insolvency under the traditional balance sheet or cash flow tests. *See Geyer*, 621 A.2d at 789.

For purposes of summary judgment, there is evidence which, when viewed in favor of the non-moving party, supports a reasonable inference that Athilon was insolvent at the time Quadrant filed suit. The defendants' motion for summary judgment on the breach of fiduciary duty claims is therefore denied.[1]

## I.    FACTUAL BACKGROUND

The facts are drawn from the materials submitted in connection with the defendants' motion for summary judgment. Rule 56 requires that the evidence be

---

[1] The defendants also sought summary judgment on the fraudulent transfer claims. There is no dispute about the relevant standard for insolvency under DUFTA, which is defined by statute, and there is ample evidence sufficient to create a dispute of fact as to Athilon's solvency at the relevant times. Rather than burdening this opinion with a discussion of DUFTA, the court has entered a separate order denying this aspect of the defendants' motion for summary judgment.

2

construed in favor of the non-movant, which is Quadrant. The court cannot weigh the evidence, decide among competing inferences, or make factual findings.

## A. The Company

Athilon was formed before the financial crisis of 2008 to sell credit protection to large financial institutions. The Company's wholly owned subsidiary, Athilon Asset Acceptance Corp. ("Asset Acceptance"), wrote credit default swaps on senior tranches of collateralized debt obligations. Athilon guaranteed the credit swaps that Asset Acceptance wrote.

To fund its operations, Athilon secured approximately $100 million in equity capital and $600 million in long-term debt. The debt was issued in multiple tranches comprising $350 million in Senior Subordinated Notes, $200 million in Subordinated Notes, and $50 million in Junior Subordinated Notes. Depending on the series, the Notes will mature in 2035, 2045, 2046, or 2047.

On the strength of its $700 million in committed capital, Athilon guaranteed more than $50 billion in credit default swaps written by Asset Acceptance. In the heady days before the financial crisis, the rating agencies gave Athilon and Asset Acceptance "AAA/Aaa" debt ratings and investment grade counterparty credit ratings.

## B. Athilon Suffers Losses And EBF Sees An Opportunity.

Athilon suffered significant losses as a result of the financial crisis. It paid $48 million to unwind one credit default swap in 2008 and an addition $320 million to unwind another credit default swap in 2010. Athilon's GAAP financial statements showed a net worth of negative $513 million in 2010. As a result, Athilon and its

subsidiary lost their AAA/Aaa ratings. Standard & Poor's gave the Company's Junior Subordinated Notes a credit rating of CC, indicating that default on the notes was a "virtual certainty." Athilon's securities traded at deep discounts, reflecting the widely held view that the Company was insolvent.

In 2010, EBF acquired significant portions of Athilon's debt. EBF's purchases included:

- Senior Subordinated Notes with a par value of $149.7 million, purchased for $37 million.

- Subordinated Notes with a par value of $71.4 million, purchased for $7.6 million.

- Junior Subordinated Notes with a par value of $50 million, purchased for $11.3 million, comprising the entire outstanding issuance.

EBF decided initially not to purchase Athilon's equity. Vincent Vertin, the EBF partner responsible for the investment, perceived that Athilon was insolvent and did not see any value in its stock. He wrote in June 2010, "What would I pay for this equity? Probably zero."

Later in 2010, EBF revisited this decision and decided to acquire all of Athilon's equity. The reason? Control. As an internal EBF document explained, "[e]quity ownership along with significant related party debt ownership affords the opportunity to control exit strategies, including the timing and size of any debt repayments, asset management fees and future dividends."

Using the control conferred by its status as Athilon's sole stockholder, EBF reconstituted the Board. At the time Athilon filed suit, the Board members were Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, and J. Eric Wagoner. Vertin was a

4

partner at EBF, and Sullivan was an in-house attorney for EBF. Both concentrated on EBF's investments in credit derivative product companies. Gonzalez was the CEO of Athilon. Jundt was a former employee of EBF. He and Wagoner appear at this stage to be independent directors.

## C.    Quadrant Sues.

Quadrant filed this derivative action on October 28, 2011. In its original complaint, Quadrant alleged that Athilon was insolvent, that its business model of writing credit default swaps had failed, and that the constitutive documents governing Athilon and Athilon Acceptance prohibited the entities from engaging in other lines of business. At the time of suit, Athilon's business consisted of a legacy portfolio of guarantees on credit default swap contracts written by Asset Acceptance that would continue to earn premiums until the last contracts expired in 2014 or shortly thereafter. Quadrant contended that given this situation, a well-motivated board of directors would maximize the Company's economic value for the benefit of its stakeholders by minimizing expenses during runoff, then liquidating the Company and returning its capital to its investors.

Quadrant alleged that instead, the Board transferred value to EBF by continuing to make interest payments on the Junior Subordinated Notes, which the Board had the authority to defer without penalty. Quadrant alleged that the Board did not exercise its authority to defer the payments because EBF owned the Junior Subordinated Notes. The Complaint also alleged that the Board transferred value from Athilon to EBF by causing the Company to pay excessive fees to ASIA, which EBF indirectly owns and controls.

5

Finally, Quadrant alleged that the Board changed the Company's business model to make speculative investments for the benefit of EBF. As an example of the shift in investment strategy, Athilon increased its holdings of auction rate securities in the first quarter of 2011. Athilon's assets previously consisted of mainly of cash, cash equivalents, blue-chip corporate equities, and a limited amount of illiquid auction rate securities. Athilon sold liquid securities with a par value of $25 million and purchased additional illiquid auction rate securities.

The Complaint alleged that by adopting an investment strategy that involved greater risk, albeit with the potential for greater return, the Board acted for the benefit of EBF and contrary to the interests of the Company's more senior creditors. The strategy benefited EBF because EBF owned the Company's equity and Junior Subordinated Notes, which were underwater and would not bear any incremental losses if the investment strategy failed. If the riskier investment strategy succeeded, then these securities would rise in value and EBF would capture a substantial portion of the benefit.

D.      The Dismissal Ruling

The defendants moved to dismiss the Complaint, arguing among other things that Quadrant failed to comply with the no-action clauses in the indentures that governed Quadrant's notes. The arguments that Quadrant made before this court about the no-action clauses had been rejected in two well-known Court of Chancery opinions: *Feldbaum v. McCrory Corp.*, 1992 WL 119095 (Del. Ch. June 2, 1992) (Allen, C.), and *Lange v. Citibank N.A.*, 2002 WL 2005728 (Del. Ch. Aug. 13, 2002) (Strine, V.C.).

Finding those opinions to be directly on point, this court granted the motion to dismiss by order dated June 5, 2012.

Quadrant appealed. Before the Delaware Supreme Court, Quadrant advanced new arguments about specific language of the no-action clauses in the Athilon notes that differed from the clauses at issue in *Feldbaum* and *Lange*. This court had not had the chance to address those arguments, which were raised for the first time on appeal. Finding the record "insufficient for appellate review," the Delaware Supreme Court directed this court to write a report addressing the newly raised arguments. *Quadrant Structured Prods. Co. v. Vertin*, 2013 WL 8858605, at *1 (Del. Feb. 12, 2013) (ORDER).

After additional briefing on remand, this court issued its report. *Quadrant Structured Prods. Co. v. Vertin*, 2013 WL 3233130 (Del. Ch. June 20, 2013). Based on the new arguments, the report concluded that the no-action clauses in the Athilon notes did not apply to Counts I through VI and IX of the Complaint, or to Count X to the extent that it sought to impose liability on secondary actors for violations of the other counts. The report concluded that the no-action clauses continued to bar Counts VII and VIII of the Complaint, as well as Count X to the extent it sought to impose liability on secondary actors for violations of the indentures.

After receiving the report, the Delaware Supreme Court certified the two questions at the heart of its analysis, which were governed by New York law, to the New York Court of Appeals. *Quadrant Structured Prods. Co. v. Vertin*, 106 A.3d 992 (Del. 2013). The New York Court of Appeals issued an opinion agreeing with the analysis set forth in the report. *Quadrant Structured Prods., Co. v. Vertin*, 23 N.Y.3d 549 (N.Y. 2014).

With the certified questions answered, the Delaware Supreme Court issued a decision applying the reasoning of this court's report as adopted by the New York Court of Appeals. As a technical matter, the Delaware Supreme Court reversed the original dismissal of the complaint. *Quadrant Structured Prods. Co. v. Vertin*, 93 A.3d 654 (Del. 2014) (TABLE). The Delaware Supreme Court did not reach the other, independent grounds that the defendants had advanced in favor of dismissal.

With the case remanded for a second time, this court evaluated the defendants' other arguments. The court held that Quadrant's complaint stated a derivative claim for breach of fiduciary duty as to the defendants' decision not to defer interest payments on the Junior Subordinated Notes and the payments of fees to ASIA, but that the complaint failed to state a claim as to the Board's adoption of a riskier business strategy. *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014). Quadrant moved for reconsideration, which the court denied. *Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535 (Del. Ch. Oct. 28, 2014).

### E.    The Motion For Summary Judgment

In February 2015, the defendants moved for summary judgment on the theory that Athilon had returned to solvency. Citing an unaudited balance sheet, they argued that as of December 31, 2014, on a GAAP basis, Athilon's total assets were valued at $593,909,343 and its total liabilities at $441,699,117, resulting in positive stockholder equity of $152,210,225. After the completion of briefing, the defendants supplied an audited balance sheet reflecting marginally more positive figures.

8

Athilon achieved balance-sheet solvency by engaging in transactions with EBF. In late 2013, Athilon agreed to issue preferred shares to EBF in return for Junior Subordinated Notes with a face amount of $50 million. In December 2014, Athilon agreed to issue additional preferred shares for Subordinated Notes and Senior Subordinated Notes with a face amount of $117.5 million. These transactions eliminated $167.5 million in debt from Athilon's balance sheet.

The Board also caused Athilon to purchase from EBF certain auction rate securities commonly known as "XXX Securities." The saucy moniker is associated with a reputable source: the securities comply with Model Regulation #830 on the Valuation of Life Insurance Policies, promulgated by the National Association of Insurance Commissioners, which is known as Regulation XXX. But the edgy overtone is not wholly undeserved: many XXX Securities became illiquid during the financial crisis when the periodic auctions for the securities failed. Quadrant disputes Athilon's calculation of the value of its XXX Securities.

Athilon improved its balance sheet further by deciding not to include a contingent tax liability, which had appeared on previous versions of Athilon's financial statements. The amount of the liability was $170.55 million at year-end 2013. The defendants contend that Athilon likely will never have to pay this liability, so the removal was proper. Yet Athilon's insistence on removing the liability apparently caused Athilon's auditor, Ernst & Young, to terminate its relationship with Athilon. Athilon's new auditor, Baker Tilly Virchow Krause LLP, appears to have signed off on the change. Quadrant disputes the propriety of removing the contingent tax liability.

Athilon improved its balance sheet even more in January 2015 when Athilon paid $179 million to EBF for Senior Subordinated Notes with a face amount of $194.6 million. As a result of that transaction, Athilon's unaudited balance sheet as of January 31, 2015, showed total assets of $402,899,084 and total liabilities of $245,131,033, resulting in stockholders' equity of positive $157,768,052. The audited numbers as of December 31, 2014, which Athilon submitted after the completion of briefing, are marginally better than these figures as well.

Quadrant regards the transactions between EBF and Athilon as additional fiduciary wrongs. For example, Quadrant contends that by selling Athilon the XXX Securities, EBF ridded itself of unwanted, illiquid assets. Athilon similarly contends that when EBF sold Athilon its Senior Subordinated Notes, EBF forced Athilon to pay 92% of face value when brokers were quoting the same notes in the market at 52%. After the motion for summary judgment was briefed, Quadrant filed an amended and supplemental complaint challenging these transactions. Those claims are not at issue for purposes of the current motion.

## II.    LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c).

> [T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party.

When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969).

The defendants contend that summary judgment should be granted in their favor because Quadrant lacks standing to sue derivatively. "[T]he creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). The defendants say that although Athilon once might have been insolvent (a point they contest), it is insolvent no longer. Because Quadrant is no longer a creditor "of an insolvent corporation," the defendants contend that Quadrant's claims should be dismissed for lack of standing. By making this argument, the defendants advocate the imposition of a continuous insolvency requirement, under which a creditor only can maintain a derivative claim during the time that a corporation actually is insolvent. Whether Delaware law imposes a continuous insolvency requirement presents a question of first impression.

The defendants also contend that summary judgment should be granted in their favor because to have standing to sue derivatively, Quadrant must establish not only that Athilon's liabilities exceed its assets but also that Athilon has no reasonable prospect of returning to solvency. The latter test—irretrievable insolvency—is one that Delaware courts use when determining whether to appoint a receiver. The defendants say it should govern whether a creditor has standing to pursue derivative claims.

11

How one views these arguments depends in part on the nature of a creditor's claim for breach of fiduciary duty. If that claim is (i) an easily invoked theory that a creditor can assert directly as the firm approaches insolvency, (ii) a powerful cause of action that defendant directors will struggle to defeat because of an inherent conflict between their duties to creditors and their duties to stockholders, and (iii) a vehicle for obtaining a judicial remedy that would involve a forced liquidation of a firm that otherwise might continue to operate and return to solvency, then strong arguments can be made in favor of counterbalancing hurdles like a continuous insolvency requirement and a need to plead irretrievable insolvency.

But if a creditor's claim for breach of fiduciary duty is less potent and more closely aligned with the interests of the firm as a whole, then the need for additional hurdles recedes. If the claim is (i) something creditors only can file derivatively once the corporation actually has become insolvent, (ii) subject by default to the business judgment rule and not facilitated by any inherent conflict between duties to creditors and duties to stockholders, and (iii) only a vehicle for restoring to the firm self-dealing payments and other disloyal wealth transfers, then strong arguments can be made against the additional requirements as unnecessary and counterproductive impediments to the effective use of the derivative action as a meaningful tool for oversight.

Which is it? In my view, *Gheewalla* and a series of decisions by Chief Justice Strine, writing while a member of this court,[2] answered the matter definitively in favor of the latter characterization. In doing so, they significantly altered the landscape for evaluating a creditor's breach-of-fiduciary-duty claim.

Before *Gheewalla* and its forerunners, the following principles were frequently asserted as true:

- The fiduciary duties owed by directors extended to creditors when the corporation entered the vicinity of insolvency.[3]

- Creditors could enforce the fiduciary duties that directors owed them through a direct action for breach of fiduciary duty.[4]

---

[2] *See Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654 (Del. Ch. July 26, 2010); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE), and *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772 (Del. Ch. 2004).

[3] *See, e.g., Weaver v. Kellogg*, 216 B.R. 563, 583-84 (S.D. Tex. 1997) ([C]orporate insiders . . . have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent . . . [but the corporation is] in the vicinity of insolvency." (internal quotation marks omitted)); *Official Comm. of Unsec. Creds. of Buckhead Am. Corp. v. Reliance Capital Gp., Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 968-69 (D. Del. 1994) ("[W]here a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise . . . including the corporation's creditors" (internal quotations omitted)); *Blackmore P'rs, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *3 (Del. Ch. Oct. 14, 2005) ([W]hether [the corporation] was insolvent or in the zone of insolvency . . . controls whether the board of directors owed fiduciary duties to [n]ote holders.").

[4] *See, e.g., In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 365 (Bankr. S.D.N.Y. 2002) (referring to the possibility that " creditors [may have] acquired . . . direct claims (e.g., breach of fiduciary duty) by virtue of the damage caused to the debtor"); Roger A. Lane, *Direct Creditor Claims for Breach of Fiduciary Duty: Is They Is, or Is They Ain't? A Practitioner's Notes from the Field*, 1 J. Bus. & Tech. L. 483, 496 (2007)

- Under the trust fund doctrine, the directors' fiduciary duties to creditors included an obligation to manage the corporation conservatively as a trust fund for the creditors' benefit.[5]

- Because directors owed fiduciary duties both to creditors and stockholders, directors faced an inherent conflict of interest and would bear the burden of demonstrating that their decisions were entirely fair.[6]

---

(referring to "a pair of decisions from the 1930s that suggest that a creditor may bring a direct claim against the director of an insolvent corporation" and citing *Pa. Co. for Insurances on Lives & Granting Annuities v. S. Broad St. Theatre Co.*, 174 A. 112, 116 (Del. Ch. 1934), and *Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931)); Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations*, 7 Geo. Mason L. Rev. 45, 66-71 (1998) (arguing that *Credit Lyonnais* created rights that are "affirmatively enforceable by creditors" against directors of companies in the vicinity of insolvency); *cf. Big Lots Stores, Inc. v. Bain Capital Fund, VII, LLC*, 922 A.2d 1169, 1172 (Del. Ch. 2006) (noting that creditors styled their breach of fiduciary duty theories as direct claims but holding that the claims were derivative).

[5] *See, e.g., Bovay v. H. M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944) ("An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors. . . . The fact which creates the trust is the insolvency." (citations omitted)); *accord Rapids Constr. Co. v. Malone*, 1998 WL 110151, at *4 (4th Cir. 1998) ("[T]he trust fund doctrine gives creditors an equitable right of recovery against shareholders who take assets from a dissolving corporation."); *Geren v. Quantum Chem. Corp.*, 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995) ("[D]irectors of a corporation may become trustees of the creditors when the corporation is insolvent."); *Saracco Tank & Welding Co. v. Platz*, 150 P.2d 918, 923 (Cal. App. 1944) ("When a corporation becomes insolvent its assets are held in trust for the benefit of the stockholders and creditors."); *Hinz v. Van Dusen*, 95 Wis. 503, 70 N.W. 657, 659 (Wis. 1897) ("[W]hen a corporation ceases to be a going institution . . . its assets in the hands of such directors become, by equitable conversion, a trust fund for the benefit of its general creditors.").

[6] *See., e.g., Askanase v. Fatjo*, 1993 WL 208440, at *5 (S.D. Tex. Apr. 22, 1993) ("[T]he business judgment rule and other rules applicable to solvent corporations are of no effect in the context of insolvency."), *report and recommendation adopted* (June 4, 1993), *aff'd*, 130 F.3d 657 (5th Cir. 1997); *N.Y. Credit Men's Adjustment Bureau v. Weiss*, 110 N.E.2d 397, 400 (N.Y. 1953) ([T]he defendants [bear] the burden of going forward to show that their action . . . resulted in obtaining full value under the circumstances in which they found themselves.); Richard M. Cieri & Michael J. Riela,

- Directors could be held liable for continuing to operate an insolvent entity and incurring greater losses for creditors under a theory known as "deepening insolvency."[7]

After *Gheewalla* and the decisions by Chief Justice Strine, at least as I read them, none of these assertions remain true. In their place is a different regime in which the following principles are true:

- There is no legally recognized "zone of insolvency" with implications for fiduciary duty claims.[8] The only transition point that affects fiduciary duty analysis is insolvency itself.[9]

---

*Protecting Directors and Officers of Corporations That Are Insolvent or in the Zone or Vicinity of Insolvency: Important Considerations, Practical Solutions*, 2 DePaul Bus. & Com. L.J. 295, 304 (2004) ("[D]irectors and officers of an insolvent or near-insolvent corporation should proceed with corporate decisions on the assumption that the business judgment rule will not apply, and that they will have to defend their actions under the much more rigorous 'entire fairness' standard.").

[7] *See, e.g., Official Comm. of Unsec. Creds. v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir. 2001) ("'[D]eepening insolvency' may give rise to a cognizable injury."); *In re Exide Techs., Inc.*, 299 B.R. 732, 752 (Bankr. D. Del. 2003) (concluding "that [the] Delaware Supreme Court would recognize a claim for deepening insolvency"); *Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (applying New York law and stating that, as to suit brought by bankruptcy trustee, "[b]ecause courts have permitted recovery under the 'deepening insolvency' theory, [defendant] is not entitled to summary judgment as to whatever portion of the claim for relief represents damages flowing from indebtedness to trade creditors"); *In re Del-Met Corp.*, 322 B.R. 781, 815 (Bankr. M.D. Tenn. 2005) (holding that counts for "deepening insolvency" stated a claim under Tennessee law).

[8] *Gheewalla*, 930 A.2d at 94 ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners.").

[9] *Id.* at 101 (rejecting the "zone of insolvency" because of "the need for providing directors with definitive guidance").

- Regardless of whether a corporation is solvent or insolvent, creditors cannot bring direct claims for breach of fiduciary duty.[10] After a corporation becomes insolvent, creditors gain standing to assert claims derivatively for breach of fiduciary duty.[11]

- The directors of an insolvent firm do not owe any particular duties to creditors.[12] They continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors.[13] They do not have a duty to shut down the insolvent firm and marshal its assets for distribution to

---

[10] *Id.* at 94 ("[C]reditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors."); *id.* at 103 ("[W]e hold that individual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors.").

[11] *Id.* at 101 ("[C]reditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties.").

[12] *Id.* at 103 ("Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors."); *Shandler*, 2010 WL 2929654, at *14 (A plaintiff "cannot base his fiduciary duty claim on the premise that the board did not do what was best for a particular class of [the corporation's] creditors.").

[13] *Prod. Res.*, 863 A.2d at 791 ("The directors [of an insolvent firm] continue to have the task of attempting to maximize the economic value of the firm. That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders— that of residual risk-bearers" (footnote omitted)); *Trenwick*, 906 A.2d at 174-75 ("So long as directors are respectful of the corporation's obligation to honor the legal rights of its creditors, they should be free to pursue in good faith profit for the corporation's equityholders. Even when the firm is insolvent, directors are free to pursue value maximizing strategies, while recognizing that the firm's creditors have become its residual claimants and the advancement of their best interests has become the firm's principal objective").

creditors,[14] although they may make a business judgment that this is indeed the best route to maximize the firm's value.[15]

- Directors can, as a matter of business judgment, favor certain non-insider creditors over others of similar priority without breaching their fiduciary duties.[16]

- Delaware does not recognize the theory of "deepening insolvency."[17] Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors.[18]

- When directors of an insolvent corporation make decisions that increase or decrease the value of the firm as a whole and affect providers of capital differently only due to their relative priority in the capital stack, directors do not face a conflict of interest simply because they own common stock or owe duties to large common stockholders. Just as in a solvent corporation, common stock ownership standing alone does not give rise to a conflict of interest. The business judgment

---

[14] *Trenwick*, 906 A.2d at 195 n.75 ("[I]nsolvency does not suddenly turn directors into mere collection agents.").

[15] *Prod. Res.*, 863 A.2d at 788 ("The *Credit Lyonnais* decision's holding and spirit clearly emphasized that directors would be protected by the business judgment rule if they, in good faith, pursued a less risky business strategy precisely because they feared that a more risky strategy might render the firm unable to meet its legal obligations to creditors and other constituencies." (footnote omitted)).

[16] *Id.* at 791-92 (citing *Pa. Co.*, 174 A. 112, and *Asmussen*, 156 A 180).

[17] *Trenwick*, 906 A.2d at 174 ("Delaware law does not recognize this catchy term as a cause of action, because catchy though the term may be, it does not express a coherent concept.").

[18] *Shandler*, 2010 WL 2929654, at *14 ("Even when [the corporation] was insolvent, the board was entitled to exercise a good faith business judgment to continue to operate the business if it believed that was what would maximize [the corporation's] value."); *Trenwick*, 906 A.2d at 205 ("If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action.").

rule protects decisions that affect participants in the capital structure in accordance with the priority of their claims.[19]

This decision analyzes the defendants' motion under the post-*Gheewalla* regime.

## A. The Potential Requirement To Show Continuing Insolvency

The defendants say Quadrant must establish that Athilon has been insolvent from the time of suit through the time of judgment. In my view, Delaware law does not impose a continuous insolvency requirement for creditor standing. Rather, a creditor must establish that the corporation was insolvent at the time suit was filed.

When exploring a novel legal argument, it helps to start with first principles. When a corporation possesses a cause of action, the board of directors is the institutional actor legally empowered under Delaware law to determine whether and to what extent the corporation should assert it. "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and

---

[19] *Shandler*, 2010 WL 2929652, at \*14 (applying business judgment rule to decision by board of insolvent entity and explaining that "[e]ven when [the entity] was insolvent, the board was entitled to exercise a good faith business judgment to continue to operate the business if it believed that was what would maximize [the entity's] value"); *Trenwick*, 906 A.2d at 195 n.75 ("Professor Bainbridge's views regarding the substantive effect the question of insolvency should have on directors' ability to rely upon the business judgment rule . . . is identical to mine—short answer none. . . ."); *id.* ("[T]he business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and . . . creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm."); *Prod. Res.*, 863 A.2d at 778 & n.52 (explaining that directors of an insolvent corporation are protected by the business judgment rule when making decisions about business strategy that indirectly affect stockholders and creditors: "the business judgment rule remains important and provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firm").

affairs of the corporation."[20] "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. "The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders." *Aronson*, 473 A.2d at 811.

Directors of a Delaware corporation owe two fiduciary duties—care and loyalty.[21] The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary

---

[20] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. It therefore omits the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

[21] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe

19

element, i.e., a condition, of the fundamental duty of loyalty." *Stone*, 911 A.2d at 370

(internal quotation marks omitted). A plaintiff can call into question a director's loyalty

by showing that the director was interested in the transaction under consideration or not

independent of someone who was. *Aronson*, 473 A.2d at 812. Or a plaintiff can

demonstrate that the director failed to pursue the best interests of the corporation and its

stockholders and therefore failed to act in good faith.[22] "A failure to act in good faith may

be shown, for instance, where the fiduciary intentionally acts with a purpose other than

that of advancing the best interests of the corporation."[23]

---

fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

[22] *See In re Walt Disney Co. Deriv. Litig. (Disney II)*, 906 A.2d 27, 53 (Del. 2006) ("Our law clearly permits a judicial assessment of director good faith for that former purpose [of rebutting the business judgment rule]."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010) ("Under Delaware law, when a plaintiff demonstrates the directors made a challenged decision in bad faith, the plaintiff rebuts the business judgment rule presumption, and the burden shifts to the directors to prove that the decision was entirely fair to the corporation and its stockholders."); *In re Walt Disney Co. Deriv. Litig. (Disney I)*, 907 A.2d 693, 760-79 (Del. Ch. 2005) (addressing whether board of directors breached its duties in connection with termination of corporation's president), *aff'd*, 906 A.2d 27.

[23] *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("'A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation' . . . ." (quoting *Disney II*, 906 A.2d at 67)); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests"); *see also*

The derivative action is a creature of equity developed by courts to prevent the "failure of justice" that would result if conflicted or disloyal fiduciaries could prevent a corporation from pursuing valid claims, including claims against its own directors and officers. *Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008).

> The stockholder's derivative suit was created in equity in the first half of the nineteenth century. Its initial purpose was to provide the stockholder a right to call to account his directors for their management of the corporation, analogous to the right of a trust beneficiary to call his trustee to account for the management of the trust corpus.[24]

---

*In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) ("[A] range of human motivations . . . can inspire fiduciaries and their advisors to be less than faithful to their contextual duty to pursue the best value for the company's stockholders."); *RJR Nabisco*, 1989 WL 7036, at *15 ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.").

[24] *Maldonado v. Flynn*, 413 A.2d 1251, 1261 (Del. Ch. 1980), *rev'd on other grounds sub nom. Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981); *see Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del. Ch. 1951) ("[W]henever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise."); *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (Wolcott, Jos., C.) ("Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress."); R. Franklin Balotti & Jesse A. Finkelstein, 1 THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 13.10, at 13–20 (3d ed. 2008) ("The fundamental purpose of a derivative action is to enforce a corporate right that the corporation has refused for one reason or another to assert."); 4 POMEROY'S EQUITY JURISPRUDENCE § 1095, at 277 (5th ed. 1941) ("The stockholder does not bring such a suit because his rights have been directly violated, or because the cause of action is his, or because he is entitled to the relief sought; he is permitted to sue in this manner simply in order to set in motion the judicial machinery of the court. . . .").

In Delaware, the Court of Chancery permitted stockholders to assert corporate claims derivatively because the stockholders were the ultimate beneficiaries of the directors' fiduciary duties and the equitable owners of the corporation. One of Delaware's great jurists, Chancellor Josiah O. Wolcott, Jr., explained that "owing to the fact that equity will look beyond the corporate entity and its legal rights and have regard for the stockholders as the beneficial and equitable owners of its assets, such stockholders may, in case the corporation refuses, invoke the aid of equity in proper cases for their protection." *Roberts v. Kennedy*, 116 A. 253, 254 (Del. Ch. 1922). In another decision, Chancellor Wolcott elaborated on this point:

> When those in control of the corporation and its assets misuse their power and wrongfully occasion loss and damage, the injury done thereby has been done to the owner of the property —the corporation. . . . It follows, therefore, that whatever cause of action may exist by reason of this breach of duty exists in favor of the corporation. The stockholders, however, who are to be regarded as the ultimate beneficial owners of the corporate assets, have an interest therein which equity in a proper case will protect. It is the duty of the corporation itself to proceed to redress the wrongs done to it and thus mediately to safeguard the interests of its stockholders. If it will not do so, or if the wrongdoers themselves are still in control of the corporation so that a suit on behalf of the corporation would be in fact a suit conducted by themselves against themselves, then the stockholders are permitted to proceed. But when they do so, they do so on behalf of the corporation whose cause of action they assert. Their right is strictly a derivative one, and the relief obtained belongs to the corporation and not to themselves.

*Harden v. E. States Pub. Serv. Co.*, 122 A. 705, 706-707 (Del. Ch. 1923).

Two themes run through these authorities. The derivative action exists to prevent injustice by facilitating a lawsuit that otherwise would not have been or could not be pursued, and stockholders have standing to assert the corporation's claim derivatively

22

because they can be regarded as the ultimate beneficial owners of the corporate assets, including litigation assets, and therefore have an interest in pursuing the claim.

When explaining why Delaware law permits creditors of an insolvent corporation to sue derivatively, Delaware cases have incorporated both themes. The more prominent theme has been equitable ownership, driven by the rationale that once a firm is insolvent, the creditors replace the stockholders as the equitable owners of the firm's assets and the initial beneficiaries of any increases in value. In *Gheewalla*, the Delaware Supreme Court explained this concept:

> When a corporation is *solvent*, [the directors' fiduciary duties] may be enforced by its shareholders, who have standing to bring *derivative* actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value. When a corporation is *insolvent*, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.
>
> Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties. The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value. Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation.[25]

---

[25] *Gheewalla*, 930 A.2d at 101-102 (footnotes and internal quotation marks omitted); *accord Prod. Res.*, 863 A.2d at 791 ("[T]he fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers."); *id.* ("[B]ecause of the firm's insolvency, creditors would have standing to assert that the self-dealing directors had breached their fiduciary duties by improperly harming the economic value of the firm, to the detriment of the creditors who had legitimate claims on its assets."); *id.* ("[T]he fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to

Also present, though less prominent, has been the theme of preventing injustice by empowering a corporate actor to pursue corporate claims that otherwise would not have been or could not be pursued. Once a firm is insolvent, the creditors benefit initially from any recovery that the firm obtains, so they have the incentive to pursue derivative claims. As the *Gheewalla* court noted, "[i]ndividual creditors . . . have the same incentive to pursue valid derivative claims on [an insolvent corporation's] behalf that shareholders would have when the corporation is solvent." 930 A.2d at 102. In *Trenwick*, Chief Justice Strine explained the concept at greater length:

> [T]he creditors become the enforcement agents of fiduciary duties [in an insolvent firm] because the corporation's wallet cannot handle the legal obligations owed . . . . In other words, the fiduciary duty tool is transferred to the creditors when the firm is insolvent in aid of the creditor's contract rights. Because, by contract, the creditors have the right to benefit from the firm's operations until they are fully repaid, it is they who have an interest in ensuring that the directors comply with their traditional fiduciary duties of loyalty and care. Any wrongful self-dealing, for example, injures creditors as a class by reducing the assets of the firm available to satisfy creditors.

906 A.2d at 195 n.75.

When a stockholder wishes to sue derivatively, Delaware common law requires that the stockholder beneficially own an interest in common stock at the time of filing and continuously throughout the litigation. *Parfi Hldg., AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 935 (Del. Ch. 2008). "The obvious purpose of the continuous

---

rectify that injury."); *id.* at 794 n.67 ("Because the creditors need to look to the firm for recovery, they are the correct constituency to be granted derivative standing when the firm is insolvent, as they are the constituency with a claim on the corporation's assets, assets which could be increased by a recovery against the directors.").

ownership rule is to ensure that the plaintiff prosecuting a derivative action has an economic interest aligned with that of the corporation and an incentive to maximize the corporation's value." *Id.* at 939.

> Once the derivative plaintiff ceases to be a stockholder in the corporation on whose behalf the suit was brought, he no longer has a financial interest in any recovery pursued for the benefit of the corporation. . . . [B]ecause a plaintiff may lose his incentive to prosecute a suit by being divested of the property interest (shares of stock) in the corporation for whose behalf he acts, the derivative suit requires "continued as well as original standing."

*Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 265-66 (Del. 1995) (quoting *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del. 1984)).

To satisfy the continuous ownership requirement, the plaintiff need not own a particular quantum of shares, or even a material ownership stake. One share is enough. "[T]he lack of any substantiality of ownership requirement limits the extent to which the continuous ownership rule checks the potential for abuse inherent in the derivative suit context, but nonetheless it does set an important, policy-based minimum." *Parfi*, 954 A.2d at 939. The continuous ownership requirement also does not necessitate record ownership. Beneficial ownership is sufficient. *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111-12 (Del. Ch. 1948) (Seitz, C.).

Under the continuous ownership requirement, if a plaintiff no longer holds stock, regardless of whether the divestiture was voluntary or involuntary, then the plaintiff loses standing to sue. Whether a plaintiff owns stock is, of course, a straightforward inquiry with a bright-line answer.

The defendants' attempt to impose a continuous insolvency requirement tries to build by analogy on the contemporaneous ownership requirement. The defendants observe that for a creditor to sue, the creditor not only must have a debt claim against the firm, but also the firm must be insolvent. They argue that if either prerequisite disappears during the course of the litigation, then standing should disappear as well.

In my view, the proper analogy to the continuous ownership requirement is a continuous creditor requirement. If the creditor no longer holds a debt claim against the corporation, regardless of whether the divestiture was voluntary or involuntary, then the creditor loses standing to sue. Whether a creditor owns a debt claim is likewise a straightforward inquiry with a bright-line answer.

By contrast, whether the corporation is solvent or insolvent is not a bright-line inquiry and often is determined definitively only after the fact, in litigation, with the benefit of hindsight.[26] Nor does it mark a transformational point when creditors suddenly gain and stockholders concomitantly lose an interest in the financial condition of the firm.

---

[26] *See Prod. Res.*, 863 A.2d at 789 n.56 ("As our prior case law points out . . . , it is not always easy to determine whether a company even meets the test for solvency."); *see also McDonald v. Williams*, 174 U.S. 397, 404 (1899) ("[I]t may be, and it sometimes is, quite difficult to determine the fact of [insolvency's] existence at any particular period of time."); *In re Tribune Co.*, 464 B.R. 126, 167 (Bankr. D. Del.) (looking to detailed expert reports to make a determination as to solvency); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 752 (Del. Ch. 2008) (citing the "normal practice" of retaining a "solvency expert" to opine on solvency); *Keystone Fuel Oil v. Del-Way Petroleum Co.*, 1977 WL 2572, at *2 (Del. Ch. Jun. 16, 1977) (noting that determining whether the corporation was solvent was difficult because the question depended on both the "opinion value of real estate, normally a variable concept" and the value of certain liabilities that were "disputed and . . . effectively in litigation").

Creditors always have some interest in improving the financial condition of the firm.[27] Entire industries are devoted to measuring the risks faced by creditors, even when the issuers are solvent. Credit ratings provide the most obvious example.

The extent to which creditors have reason to pursue corporate claims derivatively is inherently a matter of degree. It necessarily takes into account the financial health of the firm, the size of the creditor's claim, its position in the capital structure, and the risk-adjusted magnitude of the potential net recovery on the derivative claim. In a well-capitalized firm with a AAA credit rating, senior creditors would have only a marginal interest in pursuing any derivative claim that did not result in a massive wealth transfer. The senior creditors of such a firm are protected by both the equity cushion and their priority relative to junior creditors. If the derivative claim does not impinge on their interests, they likely will not care about it, unless the claim casts doubt on the integrity of management and suggests larger problems. In a less well capitalized corporation with a slim equity cushion, junior creditors with large debt positions may have greater reason to pursue a sizable derivative claim than a stockholder with an immaterial number of shares, because the corporation's recovery will provide the junior creditors with greater protection against loss. Conversely, in a firm that has dipped into balance-sheet insolvency, a significant equity holder may be more strongly motivated to pursue a

---

[27] For a thorough and now-classic discussion of the nature of a financial claimant's interest in the firm, including numerous references to the relevant literature, *see* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976).

derivative claim that could bring the corporation back to solvency than junior creditors with individually small losses, such as trade creditors. Who has the greatest interest in pursuing derivative claims? Like many things, it depends.

Despite this messy reality, there is considerable value in the predictability of bright-line rules, even when the line (as in the case of insolvency) may sometimes be fuzzy or dim. I therefore agree wholeheartedly with the *Gheewalla* court's decision to adopt insolvency as the line at which creditors gain the right to sue derivatively. Nothing about this decision stands in tension with that holding. But uncertainty about the corporation's eventual fate and the relative interests of its creditors and stockholders in pursuing derivative claims causes me to believe that a continuing insolvency requirement would be ill-advised. During the course of a litigation, a troubled firm could move back and forth across the insolvency line such that a continuing insolvency requirement would cause creditor standing to arise, disappear, and reappear again. If the corporation's financial condition fluctuated sufficiently, misconduct would evade review.

The risk is particularly acute in a situation like the current case, where the allegedly self-dealing wrongdoers own 100% of the equity. The creditors are the only corporate constituency with an economic interest in pursuing the derivative claims. If a continuing solvency requirement deprived Athilon's creditors of standing, there would be "failure of justice" because the conflicted fiduciaries could prevent the corporation and its stockholders from pursuing valid claims. *Schoon*, 953 A.2d at 208. Although the defendants would say that creditors could never be harmed by any self-dealing because Athilon is solvent, the future is uncertain. If Quadrant proves its allegations and prevails

on its claims, then Athilon will recover amounts that will make it healthier financially, improving the odds that Quadrant and Athilon's other creditors will be paid.

In my view, therefore, to maintain standing to sue derivatively, a creditor must establish that the corporation was insolvent at the time the creditor filed suit. The creditor need not demonstrate that the corporation continued to be insolvent until the date of judgment. To state the obvious, this is the opinion of one trial judge. The Delaware Supreme Court may well disagree.

The approach I have adopted admittedly creates the possibility that during the course of a derivative action, both stockholders and creditors could gain standing to sue. Before *Gheewalla* and its precursors, the existence of dual standing seemed problematic, "leading to the possibility of derivative suits by two sets of plaintiffs with starkly different conceptions of what is best for the firm." *Prod. Res.*, 863 A.2d at 789 n.56. One could envision creditors suing derivatively and alleging that the directors should pay damages for failing to chart a conservative course that preserved the firm's assets, while at the same time stockholders were suing derivatively and alleging that the same directors should pay damages for failing to chart a sufficiently aggressive course that would generate a return for the equity. Only the Goldilocks board could escape liability.

But after *Gheewalla* and its forbearers, we know that "the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and . . . creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Trenwick*, 906 A.2d at 195. Both of the conflicting derivative suits described in the preceding paragraph would fail at

the pleading stage because of the business judgment rule. They likely also would fail

because of exculpation under Section 102(b)(7). *See Prod. Res.*, 863 A.2d at 794. In the

post-*Gheewalla* world, a derivative plaintiff only can sue over acts of self-dealing and

other examples of self-interested or bad faith conduct. Any recovery benefits the firm as a

whole and inures to creditors and stockholders according to their priority.

There can, of course, still be conflicts between the interests of creditors and

stockholders. By tweaking the example that Chancellor Allen discussed in *Credit-*

*Lyonnais*, one possible conflict becomes apparent. All bracketed modifications are mine.

> Consider, for example, [an insolvent] corporation having a single asset, a
> [judgment in a derivative action] for $51 million against [the insolvent
> corporation's former directors and officers]. The judgment is on appeal and
> thus subject to modification or reversal. Assume that the only liabilities of
> the company are to bondholders in the amount of [$16] million. Assume
> that the array of probable outcomes of the appeal is as follows:

| | Expected Value of Judgment on Appeal | Expected Value |
|---|---|---|
| 25% chance of affirmance | $51mm | $12.75 |
| 70% chance of modification | $4mm | $2.8 |
| 5% chance of reversal | $0 | $0 |

> Thus, the best evaluation is that the current value of the equity is [negative
> $0.45 million]. ($15.55 million expected value of judgment on appeal—
> [$16 million] liability to bondholders). Now assume an offer to settle at
> $12.5 million (also consider one at $17.5 million). By what standard
> [should counsel in the representative action] evaluate the fairness of these
> offers? The creditors of [the insolvent] company would be in favor of
> accepting either a $12.5 million offer or a $17.5 million offer. In either
> event they will avoid the 70% risk of [receiving $4 million and the 5%
> chance of receiving nothing]. The stockholders, however, will plainly be
> opposed to acceptance of a $12.5 million settlement (under which they get
> [zero]). More importantly, they very well may be opposed to acceptance of
> the $17.5 million offer under which the residual value of the corporation
> would increase from [negative $0.45 million to $1.5 million]. This is so
> because the litigation alternative, with its 25% probability of a [$35

million] outcome to them ($51 million – [$16 million] = [$35 million]) has an expected value to the residual risk bearer of [$8.75 million ($35 million x 25% chance of affirmance)], substantially greater than the [$1.5 million] available to them in the settlement. While in fact the stockholders' preference would reflect their appetite for risk, it is possible (and with diversified shareholders likely) that shareholders would prefer rejection of both settlement offers.

*Credit-Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 17 Del. J. Corp. L. 1099, 1055 n.55 (Del. Ch. Dec. 30, 1991). Put simply, creditor-derivative plaintiffs will be incented to pursue and accept a more certain, albeit potentially lower valued settlement, while stockholder-derivative plaintiffs will favor a riskier course.

While the resulting potential for conflict is real, I believe that the court supervising the derivative litigation has ample tools available to manage it. Counsel representing the corporation are duty-bound to present a settlement if counsel believe it to be in the best interests of the corporation, regardless of the views of the named plaintiffs. *In re M&F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1176-78 (Del. Ch. 2002). If the parties or other non-parties held different views, they can object. If one side feels sufficiently bullish, they can seek to bond the settlement and take over the claims. *See Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2012 WL 1655538, *6 (Del. Ch. May 9, 2012). The court, not the litigants, ultimately makes an independent determination of fairness and decides whether to approve the settlement. *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del. 1990). Indeed, the dynamic of having two groups involved meaningfully in presenting the settlement helps a court in assessing its fairness. *Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 397 (Del. Ch. 2010).

The defendants have tried to conjure a different conflict that they say calls a continuous insolvency requirement. They argue that Quadrant seeks an order requiring the defendants to liquidate the firm, which flies in the face of a solvent entity's interest in continuing its operations. But in an earlier ruling, this court dismissed Quadrant's complaint to the extent it sought an order requiring the defendants to liquidate the firm, holding that the business judgment rule protected the defendant directors' decision to continue operating and to adopt a risk-on strategy in an effort to achieve greater profitability.[28] At present, there is no conflict between the claims that Quadrant has been permitted to pursue and the interests of Athilon.

In my view, *Gheewalla* holds that at the point of solvency, standing to sue derivatively does not shift from stockholders to creditors. Stockholders do not lose their ability to pursue derivative claims. Rather, the universe of potential plaintiffs expands to include creditors. To maintain a derivative claim, the creditor-plaintiff must plead and later prove that the corporation was insolvent at the time suit was filed. The creditor-plaintiff need not, however, plead and prove that the corporation was insolvent continuously from the time of suit through the date of judgment.

## B. The Potential Requirement To Show Irretrievable Insolvency

The defendants separately contend that summary judgment should be granted in their favor because they say Quadrant must do more than establish insolvency under the

---

[28] *Quadrant*, 102 A.3d at 193; *see also Gheewalla*, 930 A.2d at 103; *Shandler*, 2010 WL 2929654, at *13-14; *Trenwick*, 906 A.2d at 195, 200; *Prod. Res.*, 863 A.2d at 776-77, 788 n.52, 793.

traditional balance sheet test. The defendants claim that Quadrant must establish what historically has been required for a creditor to obtain the appointment of a receiver, namely a showing that the corporation is irretrievably insolvent.

The *Geyer* decision held squarely that creditors gain standing to sue derivatively when a corporation meets one of two traditional tests: the balance sheet test or the cash flow test. 621 A.2d at 789. Quadrant does not claim that Athilon is insolvent under the cash flow test, so that metric is not relevant to this case and will not be discussed further. The great weight of Delaware authority follows *Geyer* and uses the traditional formulation in which a creditor's standing to sue derivatively "arises upon the fact of insolvency," defined under the balance sheet test as when the entity "has liabilities in excess of a reasonable market value of assets."[29]

One Court of Chancery decision, however, has incorporated the concept of irretrievable insolvency into the traditional balance sheet test. In *Gheewalla*, the trial court described the test for insolvency as "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof."

---

[29] *Id.*; *see also Trenwick*, 906 A.2d at 195 n.74 (stating that "insolvency in fact occurs at the moment when the entity 'has liabilities in excess of a reasonable market value of assets held'" (quoting *Blackmore P'rs*)); *Blackmore P'rs*, 2005 WL 2709639, at *6 ("Under long established precedent, one of those circumstances is insolvency, defined not as statutory insolvency but as insolvency in fact, which occurs at the moment when the entity 'has liabilities in excess of a reasonable market value of assets held.'" (quoting *Geyer*)); *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 864 A.2d 930, 947 (Del. Ch. 2004) (explaining that "a company may be insolvent if 'it has liabilities in excess of a reasonable market value of assets held.'" (quoting *Geyer*)), *vacated on other grounds*, 875 A.2d 632 (Del. 2005) (TABLE).

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 2006 WL 2588971, at

\*10 (Del. Ch. Sept. 1, 2006). The trial court quoted this language from *Production*

*Resources*, but as discussed below, the passage came from the section of the *Production*

*Resources* opinion that addressed the appointment of a receiver. Because the Delaware

Supreme Court on appeal held that creditors could not assert direct claims for breach of

fiduciary duty as a matter of law, the high court did not address the trial court's framing

of the standard for insolvency. *See Gheewalla*, 930 A.2d at 102-103 (affirming dismissal

because the creditor "only asserted a direct claim against the director [d]efendants for

alleged breaches of fiduciary duty," and "creditors of an insolvent corporation have no

right to assert direct claims for breach of fiduciary duty against corporate directors").

The concept of irretrievable insolvency originated over a century ago in a decision

issued by the New Jersey Court of Chancery in 1892, where the court used that test when

deciding whether to appoint a receiver. *See Atl. Trust Co. v. Consol. Elec. Storage Co.*,

23 A. 934 (N.J. Ch. 1892). *See generally* Robert J. Stearn, Jr. & Cory D. Kandestin,

*Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of*

*Solvency Tests Under the Bankruptcy Code and Delaware Law*, 36 Del. J. Corp. L. 165

(2011). The Vice Chancellor of the New Jersey court stated:

> The principle which I think should control the court in the exercise of this
> power is this: never to appoint a receiver unless the proof of insolvency is
> clear and satisfactory, *and* unless it also appears that there is no reasonable
> prospect that the corporation, if let alone, will soon be placed, by the efforts
> of its managers, in a condition of solvency.

*Atl. Trust,* 23 A. at 936 (emphasis added). The court's analysis thus involved two steps.

First, there was the threshold question of insolvency, which the court elaborated on by

stating that "the power of the court . . . depends exclusively on the fact of insolvency . . . until that fact is clearly established, the court can do nothing. The proof in support of a jurisdictional fact must always be clear and convincing." *Id.* at 935. Second, there was the discretionary question of whether to appoint a receiver, which the court stressed by explaining that "the establishment of the fact of insolvency does not make it the duty of the court to appoint a receiver in all cases and under all circumstances, but simply places it in a position where it must exercise its best discretion." *Id.* at 936. The concept of irretrievable insolvency formed part of the latter, discretionary exercise of authority, such that a receiver would not be appointed, even for an insolvent corporation, "unless it also appears that there is no reasonable prospect that the corporation, if let alone, will soon be placed, by the efforts of its managers, in a condition of solvency." *Id.*

New Jersey, not Delaware, was then the leading state for incorporations. Seven years later, Delaware adopted the original version of the DGCL, modeled on the New Jersey act. *See Chi. Corp. v. Munds*, 172 A. 452, 454 (Del. Ch. 1934) (Wolcott, Jos., C.) ("[I]t is common knowledge that the general act of this state adopted in 1899 was modeled after the then existing New Jersey act"). Not surprisingly, when the Delaware Court of Chancery confronted petitions to appoint receivers, the court followed its New Jersey counterpart and adhered to the distinction between the power to appoint a receiver (triggered by insolvency) and the discretionary exercise of that power (which required something more). In Delaware, as in New Jersey, the appointing of a receiver required that the corporation have "no reasonable prospect that the business can be continued" in addition to "a deficiency of assets below liabilities." *Siple v. S & K Plumbing & Heating,*

*Inc*, 1982 WL 8789, at \*2 (Del. Ch. Apr. 13, 1982); *accord Freeman v. Hare & Chase*, 142 A. 793, 795 (Del. Ch. 1928). This additional showing was necessary because the appointing of a receiver was a "drastic" act that displaced the corporation's board of directors. *Salnita Corp. v. Walter Hldg. Corp.*, 168 A. 74, 75 (Del. Ch. 1933). "A court should never wrest control of a business from the hands of those who have demonstrated their ability to manage it well, unless it be satisfied that no course, short of the violent one, is open as a corrective to great and imminent harm." *Id.* Put differently, if the corporation's duly elected managers had a reasonable prospect of bringing the corporation to solvency, then the court should not appoint a receiver.

A close examination of precedent thus demonstrates that that the irretrievable insolvency test only applies in receivership proceedings for reasons unique to that remedy. *See* Stearn & Kandestin, *supra*, at 177. The standard of irretrievable insolvency has never governed creditor-derivative claims.

It remains true that the *Gheewalla* trial decision cited irretrievable insolvency as an aspect of the test for creditor-derivative standing, but the opinion did by quoting a passage from *Production Resources*. The *Gheewalla* trial decision did not analyze the requirement separately. Any justification for imposing an irretrievable insolvency requirement on creditor-derivative standing must therefore come from *Production Resources*. But rather than suggesting that a creditor-plaintiff must show irretrievable insolvency, the *Production Resources* decision (i) highlights the distinction between an application for a receiver and a suit alleging derivative claims and (ii) indicates that the traditional balance sheet test controls in the latter context.

The creditor-plaintiffs in *Production Resources* sought to obtain a receiver *and* to pursue claims for breach of fiduciary duty. The defendants moved to dismiss both theories. Chief Justice Strine, then a Vice Chancellor, first analyzed whether the complaint stated a claim for appointing a receiver. Following the precedent that governed that inquiry, he applied the test for irretrievable insolvency and found that the standard had been met. 863 A.2d at 782-83. He later elaborated on the role of judicial discretion when appointing a receiver in terms reminiscent of *Atlantic Trust*:

> [T]his court should not lightly undertake to substitute a statutory receiver for the board of directors of an insolvent company. . . . If, for example, the record before the court convinces the court that the board of an insolvent company is dealing even-handedly and diligently with creditor claims and is doing its best to maximize the value of the corporate entity for all creditors, then the court would have little justification for appointing a receiver.

*Prod. Res*., 863 A.2d at 786.

The Chief Justice then turned to the breach of fiduciary duty claims. Rather than revisiting the question of insolvency, he treated his earlier ruling as dispositive. This made sense: by showing irretrievable insolvency, the plaintiff met a more onerous standard than the traditional balance sheet test, so the pleading necessarily satisfied the less stringent test. Nothing in the section of the opinion addressing the breach of fiduciary duty claims suggested that a creditor had to plead irretrievable insolvency to have standing to sue derivatively. To the contrary, when discussing the point at which creditors gained standing to sue, the Chief Justice drew the line at traditional balance sheet insolvency, thereby implying that this was the point where creditors gained standing to

37

sue.[30] As I read it, *Production Resources* supports the use of the traditional balance sheet test, not the irretrievable insolvency test. I do not believe that either *Production Resources* or the trial decision in *Gheewalla* changed the law.

The defendants argue that the concept of irretrievable insolvency should be introduced as a necessary element of creditor-derivative standing. Like the *Gheewalla* trial decision, the defendants quote from *Production Resources*, but for the reasons already discussed, that case supports the traditional balance sheet test. The defendants also rely on a second Delaware Court of Chancery case, *Francotyp-Postalia AG & Co. v. On Target Technology, Inc.*, 1998 WL 928382 (Del. Ch. Dec. 24, 1998).

*Francotyp-Postalia* does not support changing the law either. It was exclusively a receivership case. The corporation in question had two 50% stockholders and an evenly divided board of directors. Under a stockholders' agreement, the board could make a capital call on the stockholders "to prevent the insolvency" of the company. *Id.* at *3. The board deadlocked on whether to make the capital call, and one of the stockholders sued for the appointment of a receiver. The court exercised its discretion not to appoint a receiver because the court found "the alleged basis for the capital call, [the joint venture's] insolvency, to be specious." *Id.* at *1.

---

[30] *See, e.g., id.* at 790 n.57 (explaining that the interests of creditors and stockholders diverge "when a firm is insolvent or near insolvency"); *id.* at 791 ("By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers."); *id.* at 792 ("The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue these claims to rectify that injury.").

When evaluating the issue of insolvency, the *Francotyp-Postalia* court observed that the two accounting experts in the case had applied different standards: the plaintiff's expert used the traditional balance sheet test and the cash flow test, while the respondent's expert only used the cash flow test. The court concluded that under the facts of the case, "the only reasonable application" of the insolvency test was the cash flow test. *Id.* at *5. The court explained its choice as follows:

> It is all too common, especially in the world of start-up companies . . ., for a Delaware corporation to operate with liabilities in excess of its assets for that condition to be the sole indicia of insolvency. Defining insolvency to be when a company's liabilities exceed its assets ignores the realities of the business world in which corporations incur significant debt in order to seize business opportunities. I cannot accept that definition as a "bright line" rule as it could lead to a flood of litigation arising from alleged insolvencies and to premature appointments of custodians and potential corporate liquidations.

*Id.* As additional support for a more stringent standard for insolvency, the court cited *Siple*, a receivership case that used the metric of irretrievable insolvency. *Id.*

As a threshold matter, because *Francotyp-Postalia* was a receivership case, it does not speak to the standard for determining insolvency when evaluating whether a creditor can sue derivatively. Considering the opinion more deeply, its language suggests that the court was responding to the accounting experts. Not surprisingly, given that context, the decision does not discuss (and the court likely was not presented with) the extensive authorities establishing that the traditional balance sheet test is not a bright-line rule

based on GAAP figures.[31] Instead, a corporation is insolvent under that test when it "has liabilities in excess of a *reasonable market value* of assets held."[32] The concept of reasonable market value takes into account "the realities of the business world in which corporations incur significant debt in order to seize business opportunities." *Francotyp-Postalia*, 1998 WL 928382, at *5. Corporations can finance these opportunities because they have real-world value, including prospect value, that is believed by those engaging in the projects and those lending the money to exceed of the amount borrowed funds.

---

[31] *See Lids Corp. v. Marathon Inv. P'rs, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002) ("This standard for solvency is typically called the 'Balance Sheet Test.". . . However, this may be a misnomer because the Balance Sheet Test is based on a fair valuation and not based on [GAAP], which are used to prepare a typical balance sheet."); *Peltz v. Hatten*, 279 B.R. 710, 743 (Bankr. D. Del. 2002) ("While the inquiry is labeled a 'balance sheet' test, the court's insolvency analysis is not literally limited to or constrained by the debtor's balance sheet. Instead, it is appropriate to adjust items on the balance sheet that are shown at a higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value."), *aff'd*, 2003 WL 1551287 (3d Cir. Mar. 25, 2003); *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994) (describing the balance sheet test as a misnomer for purposes of solvency under the Bankruptcy Code), *rev'd in part on other grounds*, 203 B.R. 890 (D. Del. 1996), *rev'd in part on other grounds*, 134 F.3d 188 (3d Cir.), *cert. denied*, 523 U.S. 1138 (1998); *see also In Re 126 LLC,* 2014 WL 3495337, at *3 (Bankr. D. N.J. July 14, 2014) (stating that solvency determinations are based on a "fair valuation" of assets (citing *In re Joshua Slocum, Ltd.*, 103 B.R. 610, 623 (Bankr. E.D. Pa.) ("GAAP principles do not control this court's determination of insolvency.")); *Ind. Bell Tel. Co. v. Lovelady*, 2007 WL 4754174, at *1 (W.D. Tex. Mar. 19, 2007) ("GAAP is considered relevant, but not conclusive, in determining whether a debtor was insolvent.").

[32] *Trenwick*, 906 A.2d at 195 n.74 (emphasis added); *accord Blackmore P'rs*, 2005 WL 2709639, at *6; *Timberlands*, 864 A.2d at 948; *Geyer*, 621 A.2d at 789.

Properly understood, the balance sheet test addresses the concerns expressed by the *Francotyp-Postalia* court.[33]

The two litigation-related concerns expressed in *Francotyp-Postalia* do not warrant jettisoning the traditional balance sheet test. First, the decision worried about "premature appointments of custodians and potential corporate liquidations," but as shown by the receivership cases, the appointment of a custodian or liquidator does not follow from a finding of balance sheet insolvency. A court applies the higher standard of irretrievable insolvency, and even if that standard is met, the court retains discretion to decline to appoint a receiver. In the seventeen years since *Francotyp-Postalia*, the continued use of the traditional balance sheet test has not led to a crisis of premature custodianships or liquidations.

Second, the decision cited a potential "flood of litigation arising from alleged insolvencies." 1998 WL 928382, at *5. Although the opinion did not identify the types of

---

[33] *See, e.g.*, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) ("[I]n determining insolvency . . . it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, *inter alia*, good will."); *In re Roco Corp.*, 701 F.2d 978, 983 (1st Cir. 1983) (stating that goodwill is included when calculating fair value for purposes of determining insolvency, and that although goodwill is typically "reported on a balance sheet [only with] hard evidence of its existence and value . . . [such as] the goodwill of a subsidiary which a parent corporation has purchased by paying an amount in excess of the fair value of the subsidiary's assets in an arms' length transaction," "the fact that goodwill was not disclosed on [a corporation's] balance sheet does not mean that the company did not possess goodwill"); *In re EBC I, Inc.*, 380 B.R. 348, 355 (Bankr. D. Del. 2008) (Unless a company "wholly inoperative, defunct or dead on its feet," the balance sheet test contemplates a valuation based on a "going concern" sale of assets.), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010).

cases that would inundate the courts, the two most logical claims are those asserted here: creditor claims for breach of fiduciary duty, and claims for fraudulent transfers. Taking them in reverse order, DUFTA contains a statutory definition for insolvency that incorporates the balance sheet test. To the extent *Franctotyp-Postalia* sought to impose a higher common law standard, it would not affect those claims. For fiduciary duty claims, however, given the pre-*Gheewalla* regime that prevailed when the *Francotyp-Postalia* decision issued, a court could be justifiably concerned about a rash of direct claims by creditors, and a court might seek to make the definition of insolvency more onerous to head off those claims. But after *Gheewalla* and its precursors, the landscape is different, and the same threat no longer exists.

Given these factors, the *Francotyp-Postalia* court's analysis of insolvency should be regarded as that decision described it: a case-specific ruling that adopted the "only reasonable application" of the insolvency test for purposes of the facts presented. The decision should not be given broader application beyond its facts.

Under *Trenwick*, *Production Resources*, *Blackmore Partners*, *Timberlands*, and *Geyer*, the traditional balance sheet test is the proper standard for determining when a creditor has standing to bring a derivative claim. Continuing to use this test has the benefit of consistency, because it aligns the measure of solvency used to determine when a creditor has standing to sue derivatively with (i) the balance sheet test established by

DUFTA,[34] and (ii) the comparable test under the Bankruptcy Code for purposes of recovering allegedly preferential or fraudulent transfers.[35] The operation of the traditional balance sheet test also parallels the statutory standard for determining whether a Delaware corporation has a cause of action against its directors for declaring an improper dividend or improperly repurchasing stock.[36] In my view, the fact that conceptually similar legal doctrines use a comparable standard reinforces the appropriateness of that metric for determining whether a creditor has standing to sue derivatively.

## C. Genuine Issues Of Material Fact As To Solvency

Under the reasoning set forth above, the relevant question for determining whether Quadrant has standing to assert derivative claims for breach of fiduciary duty is whether Athilon was insolvent under the traditional balance sheet test at the time this suit was filed. For purposes of the current motion for summary judgment, Quadrant has the burden of coming forward with evidence sufficient to create a dispute of fact as to solvency. *See*

---

[34] *See* 6 *Del. C.* § 1302(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.").

[35] *See* 11 U.S.C. § 101(32)(A) (defining insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of [the Bankruptcy Code]").

[36] *See* 8 *Del. C.* §§ 160(a)(1); *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.,* 7 A.3d 973, 982 (Del. Ch. 2010) ("As a practical matter, the [net assets] test operates roughly to prohibit distributions to stockholders that would render the company balance-sheet insolvent, but instead of using insolvency as the cut-off, the line is drawn at the amount of the corporation's capital."), *aff'd*, 37 A.3d 205 (Del. 2011).

43

*Dover Historical Soc. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

Quadrant has proffered sufficient evidence. The defendants concede that in October 2011, Athilon's balance sheet showed negative stockholders equity under GAAP to the tune of over $300 million. Although GAAP figures are not dispositive, a large deficit is indicative. The deficit here is sufficiently large to create an issue of fact.

Additional evidence takes the form of Athilon's credit ratings during the periods before and after Quadrant filed suit. At year end, 2010, Moody's rated the Senior Notes at B3 and the Subordinated Notes at Caa3. Standard & Poor's rated the Senior Notes at B, the Subordinated Notes at CCC-, and the Junior Notes at CC. In 2012, the year after suit, Standard & Poor's gave Athilon a sub-investment grade issuer credit rating of BB. It gave the Senior Subordinated Notes a debt rating of B, the Subordinated Notes a debt rating of CCC-, and the Junior Subordinated Notes a debt rating of CC. A Moody's rating of B denotes an obligation that is "speculative" and "subject to high credit risk," and a rating of B3 is the lowest rank within the B category. A rating of Caa denotes an obligation which is "judged to be speculative [and] subject to very high credit risk." A rating of Caa3 is the lowest rank in the Caa category. A Standard & Poor's rating of CCC- denotes an obligation "vulnerable to nonpayment," while a CC obligation is "highly vulnerable to nonpayment" where default is a "virtual certainty."

Still more evidence takes the form of EBF's ability to purchase Athilon's debt at significant discounts. During 2010, EBF acquired for its funds (i) Senior Notes with a face amount of $149.7 million for $37 million, (ii) Subordinated Notes with a face

amount of $71.4 million for $7.6 million, and (iii) Junior Notes with a face amount of $50 million for $11.3 million. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("[I]f the bondholders thought VFI [was] solvent, they wouldn't have sold their debt so cheaply."). Under the balance sheet test, a company is insolvent "if the total 'debt discount'—*i.e.,* the difference between the amount of its debt claims and the fair market value of those debts —is greater than the fair market value of its equity." Gregory A. Horowitz, *A Further Comment on the Complexities of Market Evidence in Valuation Litigation,* 68 Bus. Law. 1071, 1077 (2013). At year-end 2010, according to EBF, the total debt discount on three outstanding issues of Athilon notes it then held was $215.2 million, while the fair value of Athilon's equity, again according to EBF, was $45.5 million. Consistent with these discounted prices, EBF viewed Athilon's equity as being worthless. Vertin wrote in June 2010 that the equity was worth "[p]robably zero."

## III.    CONCLUSION

To establish standing to assert derivative claims as a creditor on behalf of Athilon, Quadrant must first plead and later prove that Athilon was insolvent at the time of suit. Quadrant need only show that Athilon was insolvent under the traditional balance sheet test. For purposes of the current motion for summary judgment, Quadrant has come forward with evidence sufficient to create a genuine issue of fact as to Athilon's solvency. The defendants' motion for summary judgment is denied.

45