# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In re: GENEIUS BIOTECHNOLOGY, INC., a Delaware corporation. | ) ) ) | C.A. No. 2017-0297-TMR |

## MEMORANDUM OPINION

Date Submitted: September 8, 2017
Date Decided: December 8, 2017

Adam G. Landis, Rebecca L. Butcher, James S. Green Jr., and Matthew R. Pierce, LANDIS RATH & COBB LLP, Wilmington, Delaware; *Attorneys for Petitioner*.

Patricia L. Enerio and Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Francis J. Earley and Kaitlyn A. Crowe, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C., New York, New York; *Attorneys for Respondent*.

**MONTGOMERY-REEVES, Vice Chancellor.**

The dispute in this case arises from business management disagreements between a minority stockholder and the founder of a biotechnology start-up company. The company is in the business of developing and manufacturing T-cell therapy technology implicated in treating and curing cancer. To do this, the company needs significant upfront capital, and the parties disagree, *inter alia*, about the manner in which the company should seek the much needed capital. Because of their disagreements, the minority stockholder petitioned this Court to appoint a receiver under 8 *Del. C.* § 291, alleging that the company is insolvent and a neutral party is necessary to salvage the company's remaining value, which is its intellectual property.

The threshold issue in this case is whether the company is insolvent, which the petitioner has the burden to prove by clear and convincing evidence. But the petitioner attempts to prove insolvency without providing any opinion or evidence of the value of the company's assets. Consequently, I hold in this post-trial opinion that the petitioner has not met its burden of proving the company's insolvency by clear and convincing evidence; thus, the petitioner's request is denied.

## I. BACKGROUND

On April 18, 2017, the petitioner filed a Verified Petition for Appointment of a Receiver Pursuant to 8 *Del. C.* § 291 (the "Petition") and a Motion to Expedite. On April 24, 2017, I granted the petitioner's Motion to Expedite, and the respondent

filed a Response to the Petition on May 10. On July 12 and 19, 2017, the parties conducted trial, followed by extensive post-trial briefing.

These are my findings of fact based on the parties' stipulations, documentary evidence, and testimony of two live witnesses during trial. I accord the evidence the weight and credibility I find it deserves.[1]

## A. Parties and Relevant Non-Parties

Respondent Geneius Biotechnology, Inc. ("Geneius" or the "Company") is a Delaware corporation formed on January 23, 2015.[2] It is an early-stage[3] biotechnology company seeking "to develop and manufacture T-cell therapy technology implicated in treating and curing cancer."[4] Geneius owns one U.S. patent

---

[1]  Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." I intend no disrespect. Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2]  PTO ¶ 3.

[3]  Resp't's Opening Br. 3; Pet'r's Opening Br. 11.

[4]  Resp't's Opening Br. 3. This type of technology is designed to treat various cancers, including, but not limited to, non-Hodgkin's lymphoma, gastric cancer, and nasopharyngeal cancer. Tr. 113 (Slanetz).

application that has yet to obtain approval from the United States Patent and Trademark Office.[5]

Dr. Alfred E. Slanetz is the founder, president, and chief executive officer of Geneius and has been since its incorporation.[6] Slanetz also has served as a director on Geneius's board since its incorporation.[7] Slanetz owns approximately 8.2% of Geneius issued common stock "and controls an additional 18,000,000 shares of Geneius issued common stock (approximately 54.1%)."[8] Slanetz has a bachelor's degree in biotechnology from Hamilton College, a master's degree in biomedical engineering from Brown University, and a Ph.D. in immunology and molecular biology from Yale University.[9]

Petitioner Empery Asset Master, Ltd. ("Empery") is a Cayman Islands limited company and minority stockholder of Geneius.[10] Empery is a hedge fund that "invested in Geneius because of the potential in Geneius's patents and intellectual

---

[5]      PTO ¶¶ 10-15.

[6]      *Id.* ¶¶ 3, 4.

[7]      *Id.* ¶ 16.

[8]      *Id.* ¶ 5.

[9]      Tr. 112 (Slanetz).

[10]      PTO ¶ 1.

property."[11]  Ryan Lane is the managing partner and chief compliance officer of Empery.[12]  He has a bachelor's degree in finance and accounting from Franklin & Marshall College.[13]  Lane served as a director on the Geneius board from February 2015 until January 2017.[14]  Lane brings this action on behalf of Empery as a stockholder of Geneius.

Dr. Hingge Hsu joined the Geneius board as an outside director in April 2016 and resigned in January 2017.[15]

Steven Kloeblen joined the Geneius board on the same day that Lane left the Geneius board, January 8, 2017.[16]  Thus, Slanetz and Kloeblen are the current directors on the Geneius board, and the third board seat remains vacant.[17]

Hugh Austin "controls or is otherwise affiliated with" Small Cap Nation, Valhalla Ventures, LLC, and Odin Ventures, LLC (Austin, collectively with Small

---

[11]     Pet'r's Pre-Trial Br. 10.

[12]     PTO ¶ 2.

[13]     Tr. 4 (Lane).

[14]     PTO ¶¶ 19, 32.

[15]     *Id.* ¶¶ 17-18.

[16]     *Id.* ¶ 33.

[17]     *Id.* ¶ 34; Pet'r's Opening Br. 12.

5

Cap Nation, Valhalla Ventures, LLC, and Odin Ventures, LLC, the "Austin Entities").[18] Austin is involved with family office networking.

## B. Pertinent Facts

Much of the parties' briefings and supporting exhibits relate to the various ways the parties blame one another for the Company's lack of success thus far. Because much of that information is not relevant to the resolution of this case—and because time is a finite judicial resource—I only recite the pertinent facts.

### 1. Before Lane left the Geneius board

On October 1, 2015, Geneius entered into a collaboration and license agreement with Karolinska Institutet ("Karolinska") in Sweden "to utilize Karolinska's expertise, patient access, facilities, and world class researchers, to develop a manufacturing process for its patented T-cell technology and perform clinical trials on patients in Sweden" (the "Karolinska Agreement").[19] Lane helped negotiate the Karolinska Agreement on behalf of Geneius, for which Lane received "a pretty decent amount of [Geneius stock] options."[20] Per the terms of the

---

[18] PTO ¶ 83.

[19] Resp't's Opening Br. 8; JX 28. According to Slanetz, Karolinska is "a leading medical university in Scandinavia . . . where the Nobel Prize is [] given for biotechnology and medicine." Tr. 148.

[20] Tr. 22, 37 (Lane). Lane also testified that his initial reaction to the proposed collaboration with Karolinska was, "No, we can't do it . . . we have to stay focused" because he "learned early on in investing it's not where you spend money at a

Karolinska Agreement, Geneius paid Karolinska €1.4 million up front to be used for patient enrollment; if Karolinska did not enroll patients, the money was to be returned to Geneius.[21]

Unfortunately, the Karolinska Agreement failed to meet Geneius's expectations,[22] and eventually, the majority of the Geneius board in place at that time (Lane and Hsu) voted to terminate the Karolinska Agreement over Slanetz's objection.[23] After such termination, the board considered numerous proposals to obtain financing, including a reverse merger into a public company and a rights offering.[24] Ultimately, however, none of these proposals materialized for reasons on

---

biotech; it's where you don't spend money. You have to be disciplined about staying focused, and I didn't want to do the collaboration." *Id.* at 35-36.

[21] Tr. 37 (Lane).

[22] Tr. 38-39 (Lane) ("Everything about it was a disaster. [Slanetz] set no milestones for them to achieve. There was no accountability for anything they were doing . . . Tracking what they were doing turned out to be difficult. The gentleman we hired over there . . . seemed to be more working for them than he was for us, and [Slanetz] didn't control him and have any accountability of him. Turns out the process wasn't nearly as advanced as they said it was, and then we had to allocate a bunch of -- the U.S. lab to developing the process that they said they had.").

[23] Tr. 44-45 (Lane).

[24] Tr. 49 (Lane) ("We probably looked at a half a dozen different proposals that were nontraditional because we hadn't achieved what we needed to achieve to do a traditional financing.").

7

which Slanetz and Lane differ; suffice it to say that Slanetz and Lane disagreed about the manner in which the Company should obtain financing.[25]

During their service on the Geneius board, Lane and Hsu grew increasingly frustrated with Slanetz's management and Geneius's lack of progress.[26] Lane averred that Slanetz "was good on the scientific side, the theorizing, and the process;

---

[25] With respect to why the Company did not go through with the reverse merger: Compare Tr. 56-57 (Lane) (stating Slanetz did not want to risk losing his position as CEO and the potential acquiring board was not comfortable with an alternative structure), with Tr. 203 (Slanetz) ("[T]he amount of money that . . . could be raised in a public company would not have been even enough potentially to meet the clinical milestones on our lead program . . . . And even focused on that, you'd have to raise more money and . . . the performance of the stock would only be driven by clinical news flow. It was a very challenging situation."). I give credit to Slanetz's testimony that he and Lane could not come to an agreement. Tr. 205.

With respect to the rights offering: Compare JX 56 and Tr. 207 (Slanetz) (testifying he refused the rights offering in part because the valuation was so low "that I was very concerned that that could impact our ability to go out to institutional shareholders or other shareholders and get a reasonable valuation for the company for the fund that we really needed . . . "), with Tr. 59 (Lane) (testifying that the rights offering was not pursued because Slanetz "wanted to remove me from the board because my right was up in December of that year. And if we did a rights offering, it would dilute his ownership, so he wouldn't be able to remove me with a vote of the shareholders. And so I think he wanted to push off any financing that would dilute him below 50 percent in an effort to maintain his control").

I give credit to Hsu's deposition testimony that Alfred's and Lane's dysfunctional working relationship was likely the root of the problem. Dep. Tr. 54 ("I think the fundamental objective is still to try to get capital into the company, and if [Slanetz] found someone whom he was comfortable with, I suspect he probably would have gone along with it more cooperatively than otherwise. I think I could also speculate that if [Lane] were to bring a potential investor on the financing side, that perhaps [Slanetz] would have been . . . less cooperative.").

[26] Tr. 46 (Lane).

8

but beyond that, he was not capable of managing the business."[27]  Accordingly, Lane and Hsu notified Slanetz in June 2016 that if he did not improve his managerial and operational performance, they would replace him as CEO.[28]  And Slanetz described his working relationship with Lane as "challenging" and "pretty combative at times."[29]

## 2.    After Lane left the Geneius board

In January 2017, Lane and Hsu departed from the Geneius board, and Kloeblen joined.  Nine days after Lane's departure, Lane emailed Geneius's stockholders to express his concerns about Geneius's future.[30]  Approximately two months later, Lane (on behalf of Empery) filed a books and records request under 8 *Del. C.* § 220 to "figure out how much cash [Geneius] had left and try to understand the status of things from at least a financial perspective" because "there was no one baby-sitting" Slanetz.[31]  On July 3, 2017, the parties filed a stipulation of dismissal

---

[27]    Tr. 47 (Lane).

[28]    Tr. 47; JX 21.  During the time that Lane and Hsu constituted a majority of the board, they never removed or replaced Slanetz as CEO.

[29]    Tr. 168 (Slanetz).  Lane testified that "[o]ver the course of my time on the board, there were times when I did yell at him.  I had to repeat myself sometimes dozens of times to get any action."  Tr. 87.

[30]    JX 79A; JX 106.

[31]    Tr. 68, 70 (Lane).

9

in the Section 220 action.[32]  The Company incurred approximately $150,000 in legal fees in defending Empery's Section 220 lawsuit.[33]

Also after Lane's and Hsu's departures from the Geneius board, Slanetz reinitiated the Karolinska Agreement, but he modified its terms.[34]  In addition to reinitiating the Karolinska Agreement, the board decided to pursue family office networking to attract investors.[35]  Slanetz felt that family office investors were "the perfect type" of investors to pursue "because they feel they'll get better returns without paying . . . to invest in different areas, and also they really want to leave a

---

[32]     Resp't's Opening Br. 24.

[33]     PTO ¶ 44.

[34]     JX 5 at 8; *see also* Tr. 148-49 (Slanetz) ("What we have is a letter agreement which amends the agreement that is currently kind of there . . . which they've agreed to sign . . . providing we raise the capital and also providing that Ryan is no longer involved in the collaboration.").

[35]     Tr. 132-33 (Slanetz).  Lane testified that the board never considered raising money through family offices during Lane's tenure on the board.  Tr. 51.  Lane disfavors family office networking for the following reasons: "Family offices are tough because they're not professional institutions.  They don't have a process in place to evaluate investments and to, you know, say reliable things.  They . . . like to say they love it.  They like to say they'll invest, but it often doesn't actually happen.  So you're in a process that sort of drags on and you can't rely on it.  And if you're running a business and you can't rely on the process, then you're putting everything at jeopardy."  Tr. 51-52 (Lane).

legacy and make an impact."[36] As part of his efforts,[37] he became involved with Austin, which appears to have been a disaster because Austin fraudulently charged over $50,000 to Geneius's credit card between January and March 2017.[38] Fortunately, Slanetz recouped approximately $45,000 by disputing such charges through the bank.[39] "In addition to and contemporaneously with these unauthorized charges, two unauthorized, fraudulent wire transfers totaling $29,000 were sent from Geneius's account to John Austin, Hugh Austin's son."[40] Slanetz sought repayment from Austin, and Respondent claims that "Geneius is considering its legal options to recoup these amounts."[41] Petitioner claims that Slanetz's involvement with the Austin Entities was fraudulent and reckless mismanagement.

---

[36]    Tr. 130.

[37]    Tr. 131 (Slanetz) ("We first hired consultants to help us because, really, the family office community is all about . . . making connections and relationships and building a brand . . . amongst this community.").

[38]    Tr. 164 (Slanetz).

[39]    Tr. 165 (Slanetz).

[40]    Resp't's Opening Br. 26, n.23; JX 120.

[41]    Resp't's Opening Br. 26, n.23.

### 3. Geneius's financial condition

As is not uncommon of start-up companies, Geneius "has never operated at a profit and has no income."[42] In 2015, investors contributed $10 million (approximately $2 million of which came from Empery); since then, Geneius received $100,000 from a single investor in May 2017.[43] While Geneius has not completed an update to its general ledger or accounts payable since January 2017,[44] Geneius's checking accounts had a balance of approximately $2,500 at the time Petitioner filed its Petition.[45] With respect to assets, Slanetz testified that the Company has lab equipment valued at approximately $240,000 as well as assets relating to the Karolinska Agreement worth approximately $650,000.[46] The Company's liabilities amounted to approximately $600,000, and Geneius does not have enough cash on hand to pay off in full all of its outstanding invoices.[47]

By April 2017, the board implemented several measures to improve Geneius's financial state. For example, the board reduced the number of full-time employees

---

[42]     PTO ¶ 55.

[43]     Pet'r's Opening Br. 11; JX 205.

[44]     PTO ¶¶ 55-56.

[45]     JX 183 at 3.

[46]     Tr. 177-78, 180-82; JX 51 at 4.

[47]     Tr. 214 (Slanetz).

to three people (Slanetz, Francis Kenny, and Terry Nakagawa)[48] and decreased each of their salaries to approximately the statutory minimum wage.[49] Additionally, the board approved Slanetz's personal contribution of a "temporary personal loan" in the amount of $78,000, plus his payment of "all of the travel and other business expenses for the entire company."[50] While there are no written agreements for Slanetz's personal funding of Geneius, he explained that the Company would pay back the loan's principal without interest "at some time when the Company is in a better financial situation."[51] Moreover, when asked if he would be willing to continue to contribute funds if needed, he answered "completely, absolutely."[52]

## II. ANALYSIS

Petitioner filed its Petition under 8 *Del. C.* § 291, alleging that the Company is insolvent, having no liquid assets available to satisfy existing or future obligations and no reasonable prospects of additional funding under Slanetz. Petitioner asserts

---

[48] PTO ¶ 81. Dr. Steven Landau resigned as the Head of Clinical Development in January 2017. *Id.* ¶ 78. Cassandra McGurk resigned as the Operations Manager on April 5, 2017. *Id.* ¶ 80.

[49] JX 167.

[50] Tr. 185; JX 167; JX 226.

[51] Tr. 188.

[52] Tr. 189. This evidence is further supported by the Affidavit of Alfred Slanetz filed on April 28, 2017 (the "Slanetz Aff."), in which Slanetz says he "will continue to pay the necessary costs to protect the Company's intellectual property as they come due." Slanetz Aff. ¶ 10.

13

that a receiver is necessary to "prevent complete loss of value for the Company's legitimate creditors and the stockholders,"[53] "by restoring order and independence to the Company's affairs."[54] Specifically, Petitioner asserts, in part, that "Slanetz always has controlled the Company and, since January 2017, has done so without independent oversight . . . ."[55] Petitioner argues that with such control, "Geneius will never have a marketable product under [] Slanetz's leadership."[56]

Respondent counters that Geneius is solvent and that Petitioner's request for a receiver stems from disagreements between Lane and Slanetz.

### A.    Standard for Appointment of a Receiver

When a corporation is insolvent, Section 291 of the Delaware General Corporate Law affords this Court the discretion[57] to appoint a receiver of and for the corporation.[58]    The Court applies an "insolvency plus" standard to determine

---

[53]    Pet'r's Opening Br. 4.

[54]    Pet'r's Answering Br. 18.

[55]    Pet'r's Opening Br. 2.

[56]    *Id.* Also, Petitioner argues that the Geneius board committed corporate waste and acts of bad faith, but the Petition did not assert any claims for a breach of fiduciary duty.

[57]    *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 785 (Del. Ch. 2004) (stating the plain terms of Section 291 afford this Court discretion).

[58]    8 *Del. C.* § 291 ("Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1 or more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts,

14

whether to appoint a receiver under Section 291.[59]  As a threshold matter, Petitioner

must show that the Company is insolvent "at the time the [petition] was filed,"[60] by

"clear and convincing proof."[61]  But, as "insolvency plus" implies, insolvency alone

is insufficient to invoke Section 291.  Petitioner also must demonstrate the necessity

of a neutral third party "to protect the insolvent corporation's creditors or

shareholders by showing 'some benefit that such an appointment would produce or

some harm it could avoid,'"[62] and "the potential benefits must outweigh any

potential harm that appointment of a receiver could cause."[63]

---

claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper.  The powers of the receivers shall be such and shall continue so long as the Court shall deem necessary.").

[59]  *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2010 WL 3448227, at *5 (Del. Ch. Sept. 2, 2010).

[60]  *Kenny v. Allerton Corp.*, 151 A. 257, 257 (Del. Ch. 1930) ("[Y]et if the condition of insolvency has since been removed, discretion will be exercised against the appointment of a receiver.").

[61]  *See Manning v. Middle States Oil Corp.*, 137 A. 79 (Del. Ch. 1927); *see also Whitmer v. William Whitmer & Sons*, 99 A. 428, 430 (Del. Ch. 1916) ("If there be doubt as to the proof of the jurisdictional fact, insolvency, the court should not act, for proof of jurisdictional facts should be clear and convincing.").

[62]  *Badii ex rel. Badii v. Metro. Hospice, Inc.*, 2012 WL 764961, at *7 (Del. Ch. Mar. 12, 2012) (quoting *Pope Invs. LLC v. Benda Pharm., Inc.*, 2010 WL 5233015, at *8 (Del. Ch. Dec. 15, 2010)).

[63]  *Id.* at *10 (citing *Pope*, 2010 WL 5233015, at *13).

15

## B.  Insolvency Under Section 291

While the statute is silent as to the meaning of insolvency, Delaware case law has defined insolvency in the receivership context in two ways:  (1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,"[64] or (2) "an inability to meet maturing obligations as they fall due in the usual course of business."[65]

Petitioner contends that Geneius is—and was at the time the Petition was filed—insolvent under both insolvency tests set forth in the "insolvency plus" standard.[66]  Petitioner fails to prove by clear and convincing evidence that Geneius is insolvent under either standard.

---

[64]     *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004).  This form of the balance sheet test—referred to as "irretrievable insolvency"—"is one that Delaware courts use when determining whether to appoint a receiver." *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 115 A.3d 535, 544, 558 (Del. Ch. 2015) ("A close examination of precedent thus demonstrates that [] the irretrievable insolvency test only applies in receivership proceedings . . . .").

[65]     *Siple v. S & K Plumbing & Heating, Inc.,* 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982); *see also Freeman v. Hare & Chase*, 142 A. 793, 795 (Del. Ch. 1928) ("Insolvency under the statute may be of two kinds, viz. (a) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (b) an inability to meet maturing obligations as they fall due in the usual course of business.").  This latter form of insolvency is often referred to as cash flow insolvency.

[66]     Pet'r's Opening Br. 4.

### 1. Assets versus liabilities

Petitioner avers that Geneius is insolvent because its liabilities exceed its assets. Petitioner has the burden to prove insolvency by clear and convincing evidence.

I begin with the value of the Company's liabilities, which the parties divide into two categories: legal and non-legal invoices. The parties agree that at the time of the Petition, Geneius owed approximately $185,000 in undisputed, non-legal invoices.[67] The parties also agree that "Geneius's legal fees due and outstanding are greater than or equal to $419,912.70."[68] Respondent argues that of the $419,912.70 due in legal fees, $161,712.03 of invoices to patent counsel "are subject to dispute" and, thus, should not be considered in determining the value of the Company's liabilities.[69] Respondent further argues *inter alia* that Geneius's D&O insurance carrier has paid or will pay the majority or all of the remaining $258,000 (of which $149,899 primary relates to Empery's Section 220 lawsuit) in legal fees, and thus, these fees also should not be considered in my insolvency analysis.[70] But

---

[67] PTO ¶ 37; Resp't's Answering Br. 4. Slanetz testified that he has had discussions with vendors about payment plans, but none of the alleged payment plans are in writing. Tr. 192.

[68] PTO ¶ 49.

[69] Resp't's Opening Br. 38 n.38; *see also* Resp't's Answering Br. 12; Tr. 195 (Slanetz).

[70] Resp't's Opening Br. 28; Resp't's Answering Br. 4.

Respondent does not specify which legal invoices are challenged nor any dollar amount challenged. Likewise, Respondent does not specify any dollar amount that the Company's insurance will or has covered, nor is there any evidence relating to any insurance deductible. Thus, unable to determine which liabilities to exclude based on Respondent's arguments, I find that the Company's total liabilities amounted to approximately $605,000 as of the date of the Petition, which is consistent with Slanetz's testimony that Geneius has approximately $500,000 to $600,000 in accounts payable.[71]

Determining the value of the Company's assets is a more onerous task unfortunately. Respondent contends that the value of the Company's assets is (or was at the time of the Petition) $892,546.84, which consists of (1) $2,546.84 in cash;[72] (2) $241,000 in lab equipment/fixed assets;[73] (3) $350,000 in research support funds at Karolinska;[74] and (4) $300,000 in lab materials/reagents at Karolinska.[75]

---

[71]    Tr. 220. Slanetz's testimony is consistent with a confidential offering memorandum Geneius delivered to investors in June 2017. JX 221 at 13.

[72]    JX 183 at 3.

[73]    JX 157; Tr. 177-78 (Slanetz).

[74]    Tr. 180 (Slanetz); JX 51 at 4.

[75]    Tr. 183 (Slanetz).

18

In response, Petitioner provides no evidence of its own valuation of the Company's assets. Instead, Petitioner challenges Respondent's proposed evidence of the value of the Company's assets. Petitioner objects to the valuation of $241,000 in lab equipment/fixed assets[76] on hearsay and authenticity grounds under Delaware Rule of Evidence 802 and Delaware Rule of Evidence 901, respectively. I overrule Petitioner's evidentiary objections on both grounds. This evidence falls under the business records exception in Delaware Rule of Evidence 803(6) because Slanetz ordered the specific content of the report from the Company's accountant in February 2017, received the report close in time to his request, is knowledgeable about its contents, and is a sufficiently qualified witness. Slanetz authenticated the document under Delaware Rule of Evidence 901(b) as a person with knowledge of the document because he identified the e-mail and report as a list of Geneius's equipment values that he requested and received from the Company's accountant. Petitioner also argues that Slanetz "does not have personal knowledge of the equipment's cost outside the information contained in this document, thus the Court cannot rely on Slanetz's trial testimony."[77] I disagree. Slanetz is highly involved in the Company and provided, based on his personal knowledge, a detailed explanation

---

[76]    JX 157.

[77]    Pet'r's Answering Br. 15.

19

of the assets he included in his calculation without any reference to the fixed asset report in JX 157.[78]

As for the $350,000 in research support and $300,000 in lab equipment relating to the Karolinska Agreement, Petitioner argues that both of those assets cannot be credited any value for insolvency purposes because Respondent's asset valuations are theoretical and do not represent any actual value.[79] Lane, however, concedes that the Karolinska Agreement requires any unused funds be returned to Geneius.[80] Thus, these assets have some value. But Petitioner provides no evidence of what it considers to be the actual value of these assets.

With respect to Geneius's intellectual property—which both parties agree is the Company's most valuable asset—the only evidence of its value is *Petitioner's own internal valuation* of its interest, which it valued at $31 million at the time of the Petition.[81] Petitioner argues this document is irrelevant because it is really a

---

[78]    Tr. 178 ("[T]he main piece of equipment actually is the fluorescent activated cell sorter, which is a fax machine we call it; but then there's also other laboratory equipment like hoods and incubators and the cell imager, Elispot machines; you know, general equipment. . . ."). While I recognize that JX 157 is not net of depreciation, it is at the very least an illustration of how Petitioner has not met its burden to prove insolvency by clear and convincing evidence.

[79]    Petr'r's Answering Br. 16.

[80]    Tr. 37 (Lane); JX 51 at 4.

[81]    JX 278.

20

"write-down" schedule and the value is now zero.[82]  I need not rely on this document to determine the value of the Company's assets.  Instead, it illustrates how Petitioner has not met its burden to prove insolvency by clear and convincing evidence. Petitioner argues, "[u]nable to present competent valuation evidence on its own, Geneius resorts to relying on an internal report created by Empery as proof of a $31 million Company valuation."[83]  Petitioner, however, offers no evidence of the value of what Petitioner concedes is the Company's most valuable asset and, instead, provides reasons why its *own* document relating to the value is irrelevant.  This argument is reflective of the flaw in Petitioner's approach to this entire case— Petitioner attempts to shift the burden to Respondent.  These attempts fail.  Having failed to provide any evidence of the value of the assets or to sufficiently rebut Respondent's evidence of the value of the assets, I conclude that Petitioner has not met its burden to prove by clear and convincing evidence that the Company's liabilities exceed its assets.

Even assuming *arguendo* that I attribute no value to the Company's intellectual property, the value of the Company's assets appear to exceed its liabilities.[84]  At the very least, Geneius's circumstances are similar to "cases where

---

[82]     Tr. 102 (Lane).

[83]     Pet'r's Answering Br. 16.

[84]     Compare Respondent's asset valuation of $892,546.84, with Petitioner's liability valuation of approximately $605,000. *But see Quadrant Structured Prod. Co., Ltd.*

21

the relevant corporation's assets and liabilities were approximately equal and where, with traditional financing, there appeared a prospect for viability."[85]

Alternatively, even if I were to exclude certain of Respondent's evidence of the value of its assets, I still would not appoint a receiver because the irretrievable insolvency test also requires "a deficiency of assets below liabilities with *no reasonable prospect that the business can be successfully continued in the face thereof.*"[86] During Lane's tenure on the board, the board discussed potential alternative strategies to obtain financing after Geneius terminated the Karolinska Agreement, such as a rights offering and reverse merger. But Lane testified that the board *chose* not to utilize those potential opportunities:

> I think through the course of . . . my term on the board, I brought a bunch of proposals and the board brought a bunch of proposals and we had a bunch of ideas that were never properly considered. And I think if there was someone who wasn't conflicted and was looking out for

---

*v. Vertin*, 115 A.3d 535, 552 (Del. Ch. 2015) ("whether the corporation is solvent or insolvent is not a bright-line inquiry"); *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 789 n.56 (Del. Ch. 2004) ("As our prior case law points out, . . . it is not always easy to determine whether a company even meets the test for solvency.").

[85]    *Prod. Res.*, 863 A.2d at 783 (citing *Keystone Fuel Oil v. Del–Way Petroleum, Co.*, 1977 WL 2572 (Del. Ch. Jun. 16, 1977)); *see also Pope Inv. LLC v. Benda Pharm., Inc.*, 2010 WL 5233015, at *6 (Del. Ch. Dec. 15, 2010) (citation omitted) ("If there is any doubt as to the insolvency of the corporation, a receiver should not be appointed.").

[86]    *Prod. Res.*, 863 A.2d at 782 (emphasis added).

22

the minority shareholders in place, that those would have been given adequate consideration.[87]

Thus, Lane appears to suggest that it may be possible for Geneius to pursue other financial strategies, if it so chooses; it just has not utilized the methods that Petitioner would prefer. Consequently, I am not convinced that Petitioner has demonstrated Geneius's irretrievable insolvency by clear and convincing proof.

### 2.    Cash flow insolvency

Petitioner contends that Geneius is cash flow insolvent. Petitioner has the burden to prove by clear and convincing evidence that Geneius has "an inability to meet maturing obligations as they fall due in the ordinary course of business."[88] While Slanetz conceded that Geneius does not have enough cash on hand to pay off all of its outstanding invoices,[89] Slanetz testified that the Company "pay[s] all the invoices required to run the business and keep it moving forward on an ongoing basis."[90] Slanetz also testified that certain of the invoices are in dispute or subject

---

[87]    Tr. 71. Yet when asked to describe the nature of Empery's business and operations, Lane answered, in part: "We are traditionally passive investors. So we don't take control. We're not looking to have influence in anything. We come in and we, you know, have a thesis, and we either make money or we don't." Tr. at 6.

[88]    *Prod. Res.*, 863 A.2d at 782 (citation omitted).

[89]    Tr. 214; PTO ¶¶ 38, 49.

[90]    Tr. 218; *see also* PTO ¶¶ 39, 57-64 (demonstrating that Geneius has continued to pay rent and payroll); Resp't's Opening Br. 37 (explaining "it prioritizes payments to vendors as necessary").

to payment plans.[91] Petitioner rejects this assertion because of the lack of written, third-party evidentiary support.[92] But as I have repeatedly stated herein, it is Petitioner's burden to prove insolvency by clear and convincing evidence. Petitioner could have tested the veracity of Slanetz's testimony of such payment plans either on cross-examination or through the vendors; Petitioner made the strategic decision not to do that. I have no reason not to accept Slanetz's testimony on this.

Furthermore, Slanetz testified that he is "willing to commit to fund this company as much as and as long as it takes to get us through."[93] The credibility of this evidence is supported by the fact that Slanetz made a $78,000 interest-free personal loan to the Company in April 2017 and pays "all of the travel and other business expenses for the entire Company."[94] Moreover, Slanetz does not expect

---

[91]    Tr. 192.

[92]    Pet'r's Answering Br. 13. ("Geneius presented no evidence [] of what invoices may be disputed, the basis for any legitimate dispute, or even the amount Geneius allegedly intends to dispute."); Pet'r's Answering Br. 10 ("But none of the discussions with vendors about any payment plans are in writing, and there is no testimony that any creditor, other than litigation counsel, Mintz Levin, actually agreed to defer payment. And as for Mintz Levin, the Company offered no evidence of any deferment; tellingly. Slanetz did not testify to any specifics as to amount, timeline for payment, interest rate, or other terms that would be expected for payment on a deferred basis.").

[93]    Tr. 264; *see also supra* note 52.

[94]    Tr. 185; JX 167; JX 226.

24

repayment of the interest-free personal loan until "the Company is sufficiently healthy," and he will "absolutely" continue to fund the Company if needed.[95]

Petitioner cites to *Pope Investments LLC v. Benda Pharmaceutical, Inc.* and *Production Resources Group, L.L.C. v. NCT Group, Inc.* to argue that Geneius "must demonstrate some other means by which it can pay off [its] debts in the ordinary course of business";[96] that "Geneius has expressed no intention to pay off its debts, much less demonstrate that it has some means to do so";[97] that Geneius has "no reasonable prospect of overcoming . . . insolvency"; and that Geneius "'is limping along but only through an unusual arrangement' with Slanetz's family trust 'and only by taking steps to avoid meeting its obligations.'"[98] Upon a closer review of the facts of *Pope* and *Production Resources*, I find that the instant case is readily distinguishable for the reasons explained below.

In *Pope*, this Court concluded post-trial that the company was insolvent for purposes of 8 *Del. C.* § 291; however, it did not appoint a receiver due to the lack of

---

[95]    Tr. 141, 263; Resp't's Opening Br. 37 n.35.

[96]    Pet'r's Answering Br. 17 (citing *Pope*, 2010 WL 5233015, at *7).

[97]    *Id.* at 18.

[98]    Pet'r's Opening Br. 18 (citing *Prod. Res.*, 863 A.2d at 784).

25

exigent circumstances and beneficial purpose.[99] Nevertheless, this Court considered the following facts regarding the company's financial condition to find insolvency:

- the plaintiff investment fund had obtained a judgment against the defendant company, so the plaintiff (in its capacity as a creditor) sought a receiver to allow it to recover the amount of its judgment;
- a third party bank creditor obtained an execution order on one of the company's core assets;
- the company had defaulted on a number of financial obligations, which resulted in entry of judgments against it;
- the company's current liabilities exceeded $29 million and it had a working capital deficit of over $27 million;
- the company's auditor stated the company and its subsidiaries do "not have the ability to substantially increase its loan indebtedness with any financial institution, nor can the [company and its subsidiaries] provide any assurance it will be able to enter into any loan agreements in the future";
- the company's public disclosures evidenced that the company could not raise the necessary capital for its business by selling equity or taking on new debt;
- the company had problems meeting significant regulatory deadlines and had incurred more than $2.5 million in penalties as a result; and
- the company and its subsidiaries faced significant operating difficulties and had to cease operations at various times.[100]

In *Production Resources*, this Court denied the defendant's motion to dismiss the plaintiff's Section 291 claim at the pleading stage[101] based on the following facts alleging insolvency:

- the plaintiff had obtained a $2 million judgment on the defendant company and brought suit, in part, to collect payment on such judgment;

---

[99]    *Pope*, 2010 WL 5233015, at *14.

[100]    *Id.* at *3-8.

[101]    Those parties filed a joint dismissal shortly after the abovementioned ruling.

- the company had a working capital deficit of $57.1 million and negative net tangible assets of $53.7 million;
- the company had little cash and lacked "the credit necessary to borrow at commercially reasonable rates" that would "enable it to meet its obligations going forward";
- the company's auditors had concluded that there was substantial doubt about the company's ability to continue as a going concern;
- the company had not held an annual meeting in approximately three years because it could not afford to;
- the company had issued nearly all of the shares of stock that it was authorized to issue and pledged additional shares beyond the level authorized in the certificate in order to settle pending legal claims and pay for goods and services such as rent, inventory, and temporary help;
- the company acknowledged in its SEC filings that it had been unable to repay its indebtedness as it came due on numerous occasions, and the company had a history of defaulting on the repayment of obligations to its primary creditor;
- the primary creditor allegedly had liens on all of the company's assets, including the stock of its subsidiaries; and
- instead of dealing even-handedly, the primary creditor structured its capital infusions to intentionally block the plaintiff from collecting on the debt from the company.[102]

In contrast to *Pope* and *Production Resources*, Petitioner provides no evidence that Geneius has defaulted on any loan, rent, payroll, or D&O insurance obligations; there is no evidence that Geneius has any judgment against it for any payables; there is no evidence of any liens on the Company's assets; and there is no evidence that it would impossible for Geneius to raise capital in the future.[103] Thus, I am not convinced that the Company is a hopeless endeavor.

---

[102] *Prod. Res.*, 863 A.2d at 778-80.

[103] By way of example, in one of the few email exchanges that Petitioner cites to as evidence that "multiple investors have refused to invest in Geneius [because] the

Another argument that Petitioner makes in reliance on *Production Resources*[104] concerns the way the Company manages its outstanding invoices.[105] Specifically, Petitioner argues that because the Company chooses which invoices to pay instead of paying all its outstanding invoices, it is not dealing even-handedly based on the following language in *Production Resources*:

> If, for example, the record before the court convinces the court that the board of an insolvent company is dealing even-handedly and diligently with creditor claims and is doing its best to maximize the value of the corporate entity for all creditors, then the court would have little justification for appointing a receiver.[106]

Petitioner's citation to the above-quoted language fails to recognize the distinguishing facts upon which the Court based its reasoning:

> This is not to say that a board of an insolvent company may not negotiate in good faith with creditors for the benefit of the firm. Rather, it is to emphasize that here there are facts pled that in days past would be deemed to have raised a claim for "constructive fraud." [Defendant company] is permitting [the controller] to repeatedly expand her position as a fully secured creditor, to the detriment of [the plaintiff] and other creditors in the event

Company is too early stage," Pet'r's Opening Br. 22, the potential investor also stated that "it would be great to stay in touch with the company. In particular, it would be great to meet with the team once they have some clinical data to share. We look forward to staying in touch." JX 163 at 1.

104    *Prod. Res.*, 863 A.2d at 786.

105    PTO ¶ 39; Pet'r's Opening Br. 47 (quoting Tr. 218 (Slanetz)).

106    *Prod. Res.*, 863 A.2d at 786.

of liquidation. At the same time, [the controller's] family members continue to receive lucrative payments as consultants of the company, money that could be used to pay the debt owed to [the plaintiff]. Meanwhile, defendants Parrella and Lebovics, two members of the four member [] board, who [the controller] likely has the practical power to displace, continue to draw substantial salaries. And [the controller's] new capital infusions are being placed into a subsidiary in order to avoid [the plaintiff's] collection efforts.[107]

Here, the record indicates that Slanetz is not doing anything other than negotiating in good faith with creditors for the benefit of the Company; Geneius appears to be making a bona fide effort to overcome its current financial difficulty, including the use of a survival budge, the significant cuts to payroll, the personal loans from Slanetz to the Company, and the investments in fundraising.[108] "While future prospects may not look all that good now, I have no basis to conclude at this point

---

[107] *Id.*

[108] Petitioner argues that Slanetz had a more sinister motive in his involvement with the Austin Entities. "Lured by the extravagant lifestyle, actually raising money evidently lost priority while Slanetz gallivanted around with family office consultants and seemingly high net worth investors." Pet'r's Opening Br. 16; *see also* Pet'r's Answering Br. 25-29 (alleging that Slanetz participated in bank fraud and filed a false police report to maintain his relationship with the Austin Entities). I am not convinced that Slanetz's involvement with the Austin Entities was more than an imprudent business decision, and I give credit to Slanetz's testimony that he is making a bona fide effort to move the Company forward. Tr. 132-41 (Slanetz).

with any degree of reasonable certainty that the business will be unable to overcome the difficulties of its recent past."[109]

For all of the aforementioned reasons, Petitioner has not pled insolvency by clear and convincing evidence under either definition of insolvency—which is a threshold issue.[110] "When a company is solvent, § 291 is by its plain terms not even implicated."[111] Petitioner *has* pled that this case arises out of a dispute between a founder and minority stockholder about how the Company ought to run.[112] The former appears to be incredibly knowledgeable in the biomedical industry, and the latter in the investment industry. But "[n]o mere differences of opinion among stockholders or directors as to business policy or methods pursued by the corporation can of themselves constitute a legitimate ground for the appointment of a receiver."[113]

---

[109] *Siple v. S & K Plumbing & Heating, Inc*, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982) (applying 8 *Del. C*. § 291).

[110] Thus, I need not address the remaining "plus" requirements under the "insolvency plus" standard.

[111] *Prod. Res.*, 863 A.2d at 785.

[112] *See id.* at 789 n.52 ("[T] he business judgment rule remains important and provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms.").

[113] *Banks v. Cristina Copper Mines, Inc.*, 99 A.2d 504, 507 (1953) (declining to appoint a receiver partly because officers and directors made loans to the company in order to help the company meet some of its obligations) (citations omitted).

### III.   CONCLUSION

For the foregoing reasons, I deny the Petition for Appointment of a Receiver.

**IT IS SO ORDERED**.